**FRANKLIN TP. IN SOMERSET COUNTY, N.J., et al. v. TUGWELL, Administrator Resettlement Administration, et al.**

No. 6619.

United States Court of Appeals for the District of Columbia.

Decided May 18, 1936.

Dean G. Acheson, Spencer Gordon, and Edward B. Burling, all of Washington, D. C., for appellants.

Ralph S. Boyd, of Washington, D. C., and Allan D. Jones, of Newport News, Va., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

VAN ORSDEL, Associate Justice.

Appellants, plaintiffs below, filed a bill in equity in the Supreme Court of the District of Columbia seeking to restrain defendant Tugwell, Administrator of the Resettlement Administration, and other government officers from acquiring certain privately owned lands in the township of Franklin, Somerset county, N. J. The lower court granted defendants' motion to dismiss the bill, and from that decree plaintiffs appeal.

The authority of defendants is claimed under the Emergency Relief Appropriation Act of 1935 (49 Stat. 115 [15 U.S. C.A. § 728 note]) and Executive Orders Nos. 7027 and 7200, dated April 30, 1935, and September 26, 1935, respectively.

It is averred in the bill, and by the motion to dismiss admitted, that the township of Franklin is a municipal corporation organized and existing under the laws of New Jersey, possessing the usual powers of such corporations, and deriving its revenues "almost exclusively from the inhabitants within its limits and the property located therein"; "the major portion of such revenues" being received from taxes on real estate. It is alleged that the board of education of Franklin township is a corporation organized and existing under the laws of New Jersey, charged with the duty of providing educational facilities for the inhabitants of the township, and deriving its revenues almost exclusively from the tax funds collected by the township. The plaintiffs Suydam, Van Cleef, Martin, Brill, and Alsop are property owners and taxpayers in the township.

It appears from the averments of the bill of complaint that the Resettlement Administration contemplates the erection within the township of a so-called "model community." It is the plan of the Resettlement Administration, acting through the Administrator, to purchase a large area in said township and to erect thereon single and multiple dwelling houses to accommodate approximately 750 families, and to remove into the "model community" families from congested areas in near-by manufacturing cities, low rentals being one of the principal inducements to be offered by the proposed community.

It is further averred that agents of the Resettlement Administration are securing options from owners of a large part of the real property in the area sought to be acquired; that ultimately they will pay for these lands with funds of the United States, and upon the lands so acquired the "model community" will be constructed; and that, unless they are immediately restrained, the offers to sell will be accepted by the agents, who will then take deeds for the lands covered thereby.

It is further alleged that the rentals to be charged for the houses constructed by the Administration will be at the rate of four to five dollars a month per room, which will provide a return sufficient only to meet the costs of operation and maintenance; that the Administration will erect stores and shops at the center of the proposed community, build public roads across it, construct a system of parkways and recreation grounds surrounding the proposed development; that the Administration will pursue a policy of resettling urban industrial workers of low income on this development, and of providing better homes for persons now living in houses deemed by the Administration to be of inferior quality, and that virtually no opportunities will be furnished for employment of such persons in the township in connection with the so-called "model community."

It is also alleged that the township has at present a population of approximately 6,500, the bulk of which is rural and widely scattered, that under the proposed plan the Administration will bring into the township 750 families, and that eventually more will be brought in to live upon further developments, and that this will result in an immediate increase in the population of the township of at least 3,000 persons, with the threat on the part of the Administration vigorously to push this project to completion.

It is further averred that, unless the defendants are immediately restrained from performing their threatened acts, the township will immediately lose approximately one-fourth in area of the taxable real estate, and approximately one-fourth of the value of the taxable real estate in the township, and ultimately will lose three-fifths in area of its taxable real estate and approximately three-fifths of the value of its taxable real estate; that the proposed community will separate the township into two parts, and will impair the township's ability to discharge its municipal duties in the separated portions remaining under its control; that the division of its territory will greatly increase the cost of discharging its duties; that, because of this increase in population, the duty will be imposed upon the township of providing increased health, police, and fire protection; that the expense of maintaining the proposed roads to be constructed in the community by the Administration will devolve upon the township; that the cost of maintaining the present roads in the township will be greatly increased by reason of the additional population; and that, in general, all costs of discharging the duties of local government, imposed upon the township, will be greatly increased, especially in the matter of furnishing educational facilities, which are already inadequate.

It is also averred that, under the laws of New Jersey, all real estate in the township taxable for the year 1936 was assessed and tabulated on October 1, 1935, and no other assessment or tabulation can, under the law, be made until October 1, 1936; that in 1936 the amount which the township will be required to pay to the county of Somerset on account of taxes for county purposes upon land within the township, assessed and tabulated as of October 1, 1935, will be approximately $54,000, "which amount the Township must pay in 1936 by reason of said assessment and tabulation, irrespective of whether taxes are collectable or collected"; that, if the land in question is taken and title placed in the United States, taxes cannot be collected thereon, and the township will lose one-fourth of the revenues normally received for its own needs (ap-

proximately $10,000), and in addition will lose $13,500, the amount for which the township must account as taxes on said lands, "and which said Township must pay to said County out of the balance of the revenues normally received for its own needs," thus suffering "an irretrievable loss of approximately $23,500.00, if the said lands are removed from liability for taxes in and for the year 1936."

It is further averred that the board of education will lose a large portion of the sources of revenue for discharge of its duties, because of the loss of taxes suffered by the township, and at the same time will be forced to assume added educational burdens. It is also averred that each of the individual plaintiff taxpayers will suffer an increase in taxation, and that the rental value of property now being leased by plaintiff Alsop and by the township will be depressed because of low rentals offered by the Resettlement project.

It is then averred that defendants are wholly without authority to do any of the acts which they threaten, in that the Resettlement program is not authorized by the Emergency Relief Appropriation Act of 1935, or by any other law of the United States; and that the Emergency Relief Appropriation Act of 1935 is unconstitutional, being repugnant to article 1, § 1; art. 1, § 8, clauses 1, 2 and 18; art. 1, § 9, clause 7; art. 2, § 1, and the Tenth Amendment of the Constitution.

It is urged by counsel for defendants that plaintiffs cannot maintain this action because it is, in effect, a suit against the United States, which has not consented to be sued. We are not impressed by this contention. The action here is one to restrain agents of the United States from performing allegedly illegal acts. The authority of the agents to do the things of which complaint is made is challenged. That such a suit is not one against the United States, but against the officials who are threatening performance of such illegal acts, is well settled. Philadelphia Co. v. Stimson, 223 U.S. 605, 619, 620, 32 S.Ct. 340, 56 L.Ed. 570; Lane v. Watts, 234 U.S. 525, 540, 34 S.Ct. 965, 58 L.Ed. 1440; Payne v. Central Pac. Ry. Co., 255 U.S. 228, 238, 41 S.Ct. 314, 65 L.Ed. 598.

In the Stimson Case the Supreme Court stated the rule as follows (223 U.S. 605, at pages 619, 620, 32 S.Ct. 340, 344, 56 L.Ed. 570):

"The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded. Little v. Barreme, 2 Cranch, 170, 2 L.Ed. 243; United States v. Lee, 106 U.S. 196, 220, 221, 1 S.Ct. 240, 27 L.Ed. 171, 181, 182; Belknap v. Schild, 161 U.S. 10, 18, 16 S.Ct. 443, 40 L.Ed. 599, 601; Tindal v. Wesley, 167 U.S. 204, 17 S.Ct. 770, 42 L.Ed. 137; Scranton v. Wheeler, 179 U.S. 141, 152, 21 S.Ct. 48, 45 L.Ed. 126, 133. And in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process. The principle has frequently been applied with respect to state officers seeking to enforce unconstitutional enactments. [Citing cases.] And it is equally applicable to a Federal officer acting in excess of his authority or under an authority not validly conferred. Noble v. Union River Logging R. R. Co., 147 U.S. 165, 171, 172, 13 S.Ct. 271, 37 L.Ed. 123, 125, 126; American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90.

"The complainant did not ask the court to interfere with the official discretion of the Secretary of War, but challenged his authority to do the things of which complaint was made. The suit rests upon the charge of abuse of power, and its merits must be determined accordingly; it is not a suit against the United States."

Defendants further contend that the property owners who have given options on their property are indispensable parties to this suit. It is urged that, since agents of the Resettlement Administration hold offers to sell from various landowners within the area of the proposed project, any decree rendered herein would affect the interests of these landowners, and that therefore they are indispensable parties. Defendants overlook the fact that this suit is based upon an alleged total lack of authority in the Resettlement Administration and its agents to solicit or accept these offers to sell. If these agents are without any authority to purchase the lands, the offers are a nullity, and restraint from performing the illegal acts can in no way affect or damage the parties on whose property options have been given. In Cherokee Nation v. Hitchcock, 187 U.S. 294, at page 300, 23 S.Ct. 115, 117, 47 L.Ed. 183, the Court said: "As the bill assailed gen-

erally the want of power in the Secretary of the Interior to execute leases affecting lands owned by the tribe, and referred to the application pending for a lease made by the Cherokee Oil & Gas Company, as manifesting but a particular instance in which it was charged that the Secretary of the Interior might exercise the power conferred by the statute, the corporation named was not an indispensable party to the bill. Clearly, all the persons with whom the Secretary might contract, if he exercised the discretion vested in him by the statute, were not indispensable parties to the determination of the question whether the statute had lawfully conferred such discretionary power upon the official in question."

■ We come now to the objection of defendants that the township and the board of education have no capacity or justiciable interest which will enable them to maintain this suit to protect their governmental as distinguished from their proprietary interests. Defendants in this connection rely mainly upon the case of Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937, 29 A.L.R. 1471. In that case the state of New Jersey recovered a judgment against the city of Trenton under a state statute controlling the taking of water from the Delaware river. The city claimed that this statute was unconstitutional in that it took property owned by the city in its proprietary capacity without due process. The Supreme Court, in dismissing the writ of error sued out by the city, said (262 U.S. 182, at pages 191, 192, 43 S.Ct. 534, 538, 67 L.Ed. 937, 29 A.L.R. 1471): "The distinction between the municipality as an agent of the state for governmental purposes and as an organization to care for local needs in a private or proprietary capacity has been applied in various branches of the law of municipal corporations. * * * Recovery is denied where the act or omission occurs in the exercise of what are deemed to be governmental powers, and is permitted if it occurs in a proprietary capacity. The basis of the distinction is difficult to state, and there is no established rule for the determination of what belongs to the one or the other class. It originated with the courts. Generally it is applied to escape difficulties, in order that injustice may not result from the recognition of technical defenses based up-

on the governmental character of such corporations. But such distinction furnishes no ground for the application of constitutional restraints here sought to be invoked by the city of Trenton against the state of New Jersey. They do not apply as against the state in favor of its own municipalities."

It is clear under the decision in this case that, if the state of New Jersey were substituted for the officers of the United States in the Resettlement program, the township and board of education could not maintain this suit, regardless of whether their claimed interests were governmental or proprietary. But this situation would obtain by reason of the fact that the township and board of education are merely political subdivisions of the state of New Jersey, from which they derive their existence and powers, and which may terminate their existence at any time. This reasoning, however, in no way prevents these corporations from maintaining suit against officials of the United States, a sovereign separate and distinct from the state of New Jersey.

We think the township's interests which may be denominated governmental involve much more than the mere matter of taxation. The impairment of its powers in the exercise of its franchise is the chief subject of concern. It may be conceded that the reduction in its tax receipts, involved in the loss of realty by reason of the establishment of the model community, can be remedied by increasing its tax rate, with the additional burden falling upon the individual taxpayers. Florida v. Mellon, 273 U.S. 12, 18, 47 S.Ct. 265, 71 L.Ed. 511. A very different question arises, however, when we consider the impairment of the township's corporate functions by the separation and reduction of the property which is left to it. We are of opinion that this interest, though governmental, may be invoked to enable the township to maintain this suit. The Supreme Court, in the case of Re Debs, Petitioner, 158 U.S. 564, 583, 584, 15 S.Ct. 900, 906, 39 L.Ed. 1092, said:

"Neither can it be doubted that the government has such an interest in the subject-matter as enables it to appear as party plaintiff in this suit. It is said that equity only interferes for the protection of property, and that the government has no property interest. A sufficient reply is

that the United States have a property in the mails, the protection of which was one of the purposes of this bill. * * *

"We do not care to place our decision upon this ground alone. Every government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court."

While the national government was involved in the Debs Case, the words "every government" appear to be broad enough to include a state, or a political subdivision of a state, such as the municipality here involved, which it is alleged is "charged by law with the duty of providing for its inhabitants adequate police and fire protection, sewage and garbage disposal, maintenance of public roads, education facilities, care of the poor, zoning of the use of property within its limits, and the other normal incidents of local government."

We think that the case of People v. Ingersoll, 58 N.Y. 1, 17 Am.Rep. 178, conclusively sustains the township's position. In that case suit was brought by the state of New York to recover money of which the county of New York had been defrauded. It was held that only the county could maintain the suit. The court specifically stated that the "trusteeship and corporate power [of the County], as a pecuniary and fiduciary relation, extends to and embraces not only the tangible property of the corporation, but the franchises and powers conferred for raising moneys and other means for the support of the local government and the use of the inhabitants of the county, and to the means realized from the franchises and powers conferred." The court further held that, while there could not be a claim in both the county and the state, and though the county is entirely subject to the state, yet, "when grants, whether of rights or of power, are conferred by the legislature they are held absolutely, and

to be enjoyed and exercised independently, subject only to the general laws of the State, the terms and conditions annexed to the grant, until withdrawn or modified by the legislature."

Aside from its governmental interests, however, the township has a proprietary interest which would enable it to maintain this suit. It is the owner of real property within its limits which it leases to a private individual, the value of which property the township alleges is threatened with impairment. Unquestionably this interest is proprietary. Ferguson v. Arthur, 117 U.S. 482, 487, 6 S.Ct. 861, 29 L.Ed. 979.

Coming now to a consideration of whether or not the board of education may maintain this suit, it appears that it has no proprietary interest as has the township. It further appears that in the discharge of its duties the necessary funds are paid over to it by the treasurer of the township, which is primarily responsible for providing educational facilities for its inhabitants. While the board is a corporation with power to sue and be sued, it is subsidiary to, and dependent upon, the township. It is in fact an agency of the township, and possesses no governmental interests distinct from those of the township. No claim is made that the corporate franchise of the board will be impaired. No territory will be taken from its jurisdiction. The fact is that it will still have to exercise its functions and perform its duties with respect to the same territory as before. The only complaint is that it will have to provide additional school facilities, but for this purpose it will merely call upon the township for additional funds. We are of opinion that the board of education is without capacity to maintain this suit.

At this point it is proper to consider an objection interposed by defendants that the township cannot maintain this suit since it is brought outside the state of New Jersey. Defendants, in support of this objection, rely upon the case of Moore v. Mitchell, 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673, wherein it was held that the treasurer of a county in Indiana could not maintain suit to collect taxes in a federal District Court in New York. This case, we think, is not in point. The township is not a mere arm of a foreign state, seeking to enforce a claim arising under the laws of a foreign jurisdiction, but a juristic person, having a franchise and proprietary interest

to protect. We think that the township may maintain this suit against the defendants, who reside in the District of Columbia and can be served with process only there.

We come now to a consideration of the capacity of the individual plaintiffs to maintain this action, and of their justiciable interests. The mere claim that the rental value of the property now being leased by plaintiff Alsop will be depressed because of low rentals offered by the Resettlement project constitutes, in our opinion, no legal injury to her. No legal right of hers is invaded. It is merely damnum absque injuria. New Orleans, M. & T. Railroad Co. v. Ellerman, 105 U.S. 166, 26 L.Ed. 1015; United States ex rel. New York Warehouse, Wharf & Terminal Ass'n, Inc., et al. v. Dern, 63 App.D.C. 28, 68 F.(2d) 773.

A different conclusion, however, must be reached as to the claim of the individual plaintiffs, as taxpayers, that, by reason of the acquisition of title to these lands by the United States, they will be compelled to pay greatly increased taxes. The taxpayers of a municipality have a direct interest in the application of its moneys. Crampton v. Zabriskie, 101 U.S. 601, 609, 25 L.Ed. 1070; Frothingham v. Mellon, 262 U.S. 447, 486, 43 S.Ct. 597, 67 L.Ed. 1078.

We are not unmindful of the general rule which recognizes that a federal taxpayer has an interest in the moneys in the Treasury, but denies individual federal taxpayers relief on the ground that their interest is "comparatively minute and indeterminable." It is held that the effect upon future federal taxation of any payment out of federal funds is "so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." Frothingham v. Mellon, supra, 262 U.S. 447, at page 487, 43 S.Ct. 597, 67 L.Ed. 1078; Magnano Co. v. Hamilton, 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109. The Court pointed out in the Frothingham Case that a federal taxpayer shares his interest with millions of other taxpayers, and said (262 U.S. 447, at page 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078):

"The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

We think that the facts in the case at bar distinguish it from the Frothingham and Magnano Cases, which are cited by defendants as authorities for the proposition that the individual plaintiffs have no interest which will sustain this suit. In those cases the individual was a taxpayer in the same position as millions of other citizens paying federal taxes. In the case at bar the plaintiffs are taxpayers in a municipality having a population of only 6,500 (many of whom are not taxpayers) the chief portion of the revenues of which is derived from taxes on real estate.

The interest of the municipal taxpayer arises from his liability to increased taxation. The attempted creation of a debt by a municipality, or some other action which is likely to cause an increase in the tax burden, may be challenged by the individual taxpayer. Crampton v. Zabriskie, 101 U.S. 601, 25 L.Ed. 1070; Mayor and City Council of Baltimore v. Employers' Ass'n of Maryland, 162 Md. 124, 159 A. 267. It has been held in many cases that, where there is an attempt on the part of a city to extend its boundaries to include the property of one located in another taxing district, the property owner may enjoin the effort, if it be illegal, on the ground of increase in his taxes. Layton v. Mayor and Council et al. of City of Monroe, 50 La.Ann. 121, 23 So. 99; Sharkey v. City of Butte, 52 Mont. 16, 22, 155 P. 266; Morris v. City of Nashville, 74 Tenn.(6 Lea) 337; City. of Delphi et al. v. Startzman et al., 104 Ind. 343, 3 N.E. 937. On the same principle it has been held that, where a detachment of property from a municipality will throw upon the remaining taxpayers the full burden of municipal indebtedness, not only the municipality, but the remaining taxpayers, may be heard in a court of equity to resist the detachment. The City of Galesburg v. Hawkinson et al., 75 Ill. 152.

While these cases relate to suits by taxpayers against the municipality to prevent an injury which is threatened by the municipality, we see no distinction where, as in the present case, the same injury is threatened by the action of an outside agency. The injury to the citizen is the same, and the right to prevent the injury should be the same, whether it is

threatened by the municipality or by some other governmental agency.

We think, therefore, that the owners of real property in this municipality will suffer such a direct and immediate injury from the detachment of a large portion of the taxable property of the township, and the resulting increase in taxation, as will give them a standing in a court of equity to contest the legality of the proposed action of the defendants.

Defendants insist that we should not, on this appeal, consider the constitutional questions involved, but that, should it be decided that the plaintiffs or any of them can maintain this suit, the decree should be reversed and the case remanded for answer and trial upon the merits.

As grounds for the motion to dismiss in the court below it was alleged that: "The Emergency Relief Appropriation Act of 1935 is a valid and lawful exercise of the legislative power, not in conflict with any provision or prohibition of the Constitution of the United States"; and that: "The action taken and proposed by these defendants in respect of the specified Resettlement Project was pursuant to authority lawfully conferred and not in excess thereof, and such action does not and will not violate any constitutional rights of plaintiffs."

■ The trial justice filed no written opinion, and his final decree dismissing the bill of complaint does not indicate upon what ground he based his decision. It must be assumed upon this record that he considered and decided all questions raised by the motion to dismiss, including the question of the constitutionality of the Emergency Relief Appropriation Act of 1935.

By that act (section 1 [15 U.S.C.A. § 728 note]), Congress appropriated the sum of $4,880,000,000 to be available for the following classes of projects: "(a) Highways, roads, streets, and grade-crossing elimination, $800,000,000; (b) rural rehabilitation and relief in stricken agricultural areas, and water conservation, trans-mountain water diversion and irrigation and reclamation, $500,000,000; (c) rural electrification, $100,000,000; (d) housing, $450,000,000; (e) assistance for educational, professional and clerical persons, $300,000,000; (f) Civilian Conservation Corps, $600,000,000; (g) loans or grants, or both, for projects of States, Territories, Possessions, including subdivisions and agencies thereof, municipalities, and the District of Columbia, and self-liquidating projects of public bodies thereof, where, in the determination of the President, not less than twenty-five per centum of the loan or the grant, or the aggregate thereof, is to be expended for work under each particular project, $900,000,000; (h) sanitation, prevention of soil erosion, prevention of stream pollution, sea coast erosion, reforestation, forestation, flood control, rivers and harbors and miscellaneous projects, $350,000,000: Provided further, That not to exceed 20 per centum of the amount herein appropriated may be used by the President to increase any one or more of the foregoing limitations if he finds it necessary to do so in order to effectuate the purpose of this joint resolution."

The act (sections 4–6) then provides: "In carrying out the provisions of this joint resolution the President is authorized to establish and prescribe the duties and functions of necessary agencies within the Government * * * to acquire, by purchase or by the power of eminent domain, any real property or any interest therein, and improve, develop, grant, sell, lease (with or without the privilege of purchasing), or otherwise dispose of any such property or interest therein." And: "The President is authorized to prescribe such rules and regulations as may be necessary to carry out this joint resolution, and any willful violation of any such rule or regulation shall be punishable by fine of not to exceed $1,000."

It is further provided by the act (section 7) that the President shall have power to fix the rates of wages that shall be paid persons employed on any of the projects provided for in the act, and that a report shall be submitted to the Congress which shall include "a statement of the expenditures made and obligations incurred, by classes and amounts." Section 15.

Executive Order No. 7027 provides, among other things: "By virtue of and pursuant to the authority vested in me under the Emergency Relief Appropriation Act of 1935, approved April 8, 1935 (Public Resolution No. 11, 74th Congress), I hereby establish an agency within the Government to be known as the 'Resettlement Administration,' and appoint Rexford G. Tugwell, Under Secretary of Ag-

riculture, as Administrator thereof, to serve without additional compensation."

In Executive Order No. 7200 the President prescribes the functions and duties of the Resettlement Administration, to be performed by the Administrator, as follows: "To administer approved projects involving rural rehabilitation, relief in stricken agricultural areas, and resettlement of destitute or low-income families from rural and urban areas, including the establishment, maintenance, and operation, in such connection, of communities in rural and suburban areas."

The Administrator is authorized by Executive Order No. 7027 "to acquire, by purchase or by the power of eminent domain, any real property or any interest therein and improve, develop, grant, sell, lease (with or without the privilege of purchasing), or otherwise dispose of any such property or interest therein."

It is urged by plaintiffs that this act, in so far as it affects them, violates section 1 of article 1 of the Constitution, which provides: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives"; and clause 18 of section 8 of article 1, which provides: "The Congress shall have Power * * * to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

It is axiomatic in constitutional law that Congress cannot delegate the law-making power with which it is vested by the Constitution. It may, however, lay down policies and establish standards, leaving to selected instrumentalities the making of subordinate rules within prescribed limits, the filling up of details, and the determination of facts to which the policy as declared by the Legislature applies.

The Supreme Court had occasion to consider this question exhaustively in the case of Panama Refining Co. v. Ryan, 293 U.S. 388, 414, 55 S.Ct. 241, 79 L.Ed. 446. That case involved the constitutionality of section 9 (c) of the National Industrial Recovery Act (15 U.S.C.A. § 709 (c), which provided: "The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof pro-duced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State."

In holding that this section was an unconstitutional delegation of legislative power, the Court laid down a threefold test, to wit: Whether Congress has declared a policy with respect to the subject; whether Congress has set up a standard for the President's action; whether Congress has required any finding by the President in the exercise of the authority conferred.

In determining whether the statute met these requirements, the Court said (293 U.S. 388, at pages 415, 430, 55 S.Ct. 241, 246, 79 L.Ed. 446):

"It [Section 9 (c)] establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action. The Congress in section 9 (c) thus declares no policy as to the transportation of the excess production. So far as this section is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. * * *

"Thus, in every case in which the question has been raised, the Court has recognized that there are limits of delegation which there is no constitutional authority to transcend. We think that section 9 (c) goes beyond those limits. As to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited."

In Schechter Poultry Corp. v. United States, 295 U.S. 495, 529, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, the Supreme Court again had before it the question of delegation of power, in connection with section 3 of the National Industrial Recovery Act (15 U.S.C.A. § 703), which provided that "codes of fair competition," which should be the "standards of fair competition" for the trades and industries to which they relate, might be approved by the President upon application of representative associations of the trades or industries to be affected, or which

might be prescribed by him on his own motion; that their provisions were to be enforced by injunctions from the federal courts, and "any violation of any of their provisions in any transaction in or affecting interstate commerce" was to be deemed an unfair method of competition within the meaning of the Federal Trade Commission Act (15 U.S.C.A. § 41 et seq.), and was to be punished as a crime against the United States; that, before approving, the President was to make certain findings as to the character of the association presenting the Code and absence of design to promote monopoly or oppress small enterprises, and had to find that it would "tend to effectuate the policy of this title"; that the President might "impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees and others, and in the furtherance of the public interest," and might "provide such exceptions and exemptions from the provisions of such code" as he, in his discretion, deemed necessary "to effectuate the policy herein declared."

■ The Court, without trifling with any findings of fact, where no statements of fact could throw additional light upon the question of unlawful delegation of power, said (295 U.S. 495, at page 530, 55 S.Ct. 837, 843, 79 L.Ed. 1570, 97 A.L.R. 947): "Accordingly, we look to the statute to see whether Congress has overstepped these limitations—whether Congress in authorizing 'codes of fair competition' has itself established the standards of legal obligation, thus performing its essential legislative function, or, by the failure to enact such standards, has attempted to transfer that function to others."

In the present case the question of constitutionality can be determined from the face of the act. · Consequently, no findings of fact could affect the proper determination of this question.

The Court in the Schechter Case, in discussing the limitations upon the power of the Congress to delegate legislative power, then said:

"But Congress cannot delegate legislative power to the President to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry. * * *

"The act provides for the creation by the President of administrative agencies to assist him, but the action or reports of such agencies, or of his other assistants —their recommendations and findings in relation to the making of codes—have no sanction beyond the will of the President, who may accept, modify, or reject them as he pleases. * * *

"Section 3 of the Recovery Act (15 U.S.C.A. § 703) is without precedent. It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction, and expansion described in section 1. In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered. We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power."

■ Turning now to the Emergency Relief Appropriation Act of 1935, and examining it in the light of the principles laid down in the decisions in the Panama and Schechter Cases, it appears that, in so far as this case is concerned, there is a clearly unconstitutional delegation of legislative power.

There nowhere appears that adequate definition of the subject called for in the Schechter Case. The money appropriated is made available for classes of projects, among which is one designated merely as "housing."

There is nothing in the act directly prescribing the powers or duties of the President with respect to housing. ·Assuming that it may be inferred from the act that the funds are to be used by the President, yet there is nothing requiring their use either absolutely or in any specified condition or circumstance. He is free to use them or not, as he sees fit.

Assuming, however, that the President is impliedly directed to use these funds,

the only criterion or standard to guide him is that the money is to be expended for "housing projects." There is no guide as to where or when or how these funds are to be expended for housing. Indeed, the only mandatory provisions in the entire statute are that certain administrative officers, receiving more than $5,000 per annum, shall be appointed by the President, by and with the advice and consent of the Senate (section 3 [15 U.S.C.A. § 728 note]); that the President shall require such rates of pay to be paid to all persons engaged upon any project financed by this act as will, in his discretion, accomplish the purposes of the statute (section 7); that "wherever practicable" full advantage shall be taken of the facilities of private enterprise (section 8); that no part of the funds appropriated by the act shall be expended for the administrative expenses of any department, bureau, board, commission, or independent agency of the government if such administrative expenses are ordinarily financed from annual appropriations, unless additional work is imposed by reason of this act (section 11); that supplies purchased and grants made under this act shall be subject to certain provisions of the Treasury and Post Office Appropriation Act of 1934, 41 U.S. C.A. §§ 10a, 10b, 10c and note, (section 13); and that a report of operations under this statute, containing a statement of the expenditures made, shall be submitted to the Congress within a prescribed period (section 15).

Outside these restrictions, if they may be called such, the President is free to inaugurate any conceivable kind of housing project. His discretion, in the language of the Schechter decision, is "virtually unfettered." He is at liberty to set up agencies and to prescribe such rules of conduct and fix such standards as he may deem proper. There is no criterion to govern his course as to housing and the various other projects enumerated in the act. The only possible guide or policy laid down by Congress is in the words, "in order to provide relief, work relief and to increase employment by providing for useful projects," which appear at the beginning of the act. But this declaration of purpose is even more general and vague than the declaration of policy rejected in the Panama and Schechter Cases. The act is silent as to any determination of facts by the President or by any administrative agency which he may create to carry out any of the projects set forth. The only place where a finding is even suggested is in the first section of the act, where it is stated that "not to exceed 20 per centum of the amount herein appropriated may be used by the President to increase any one or more of the foregoing limitations if he finds it necessary to do so in order to effectuate the purpose of this joint resolution." If the power here granted to increase the maximum amount specified by 20 per cent. of the entire appropriation be invoked, we find that it is possible to expend, upon the indefinite project of "housing," the sum of $976,000,000 in excess of the maximum specified, or a total upon this project alone of $1,426,000,000. It logically follows that the President and not the Congress is to legislate with respect to housing. The President, not the Congress, is to set up governmental agencies to carry out the purposes of the act. The President, not the Congress, is to prescribe the regulations and rules of conduct which shall govern. The President, not the Congress, is to decide where and when and how, if at all, this enormous sum of money is to be expended for "housing."

In pursuance of the authority purported to be conferred, the President, by executive order, has established a so-called *Resettlement* Administration—not a *Housing* Administration—and by the same order he has prescribed certain functions and duties to be exercised and performed by the Resettlement Administrator. Nowhere in the act is there a word or a syllable authorizing a policy of resettling destitute or low-income families, or of shifting the populations of states and communities, nor does any authority appear for the organization of a Resettlement Administration for the purpose of establishing model communities. In the whole plan as developed the housing feature appears to be merely incidental and subordinate.

Considering what is here attempted to be accomplished, in the light of the provisions of the act, we repeat the significant words of Mr. Justice Cardozo in his concurring opinion in the Schechter Case: "This is delegation running riot."

In what we have said we do not lose sight of our duty to construe the act so as to avoid, if fairly possible, the conclusion that it is unconstitutional. In an effort to carry out this judicial obligation,

we have endeavored to find in the act language which would enable us to say that Congress had declared a legislative policy with relation to "housing" with sufficient definiteness to avoid the charge of an unconstitutional· delegation of legislative power. But, as we have pointed out, this is not to be found. We are not here confronted with an appropriation for internal improvements of a national character or importance, or for the erection of public buildings, or the grant of loans to a state or municipality to carry out public works projects. As to these we might find in the nature of the objective a well-beaten path by which to supply the omitted means to that end. But here we have neither path nor program. Obviously, if the President were so disposed, he could use the entire sum appropriated in building houses exclusively for our colored population, or, on the other hand, he could just as well exclude that portion of the population from any· benefits whatever. Nor is any limitation on the use prescribed by the act. The houses for which this vast sum of money is to be spent may be rented or sold, at a profit or at a loss. They may be constructed in cities where there is no demand, or in the country to create and build a new city in its entirety. Indeed, they may be built and left unoccupied; and while, as a practical matter, this may be said to be a mere fancy, the principle is none the less involved, for that principle demands that in the appropriation of the public moneys the congressional mandate shall include a reasonable limitation on the discretion of the executive in their use.

■ There is another fatal objection to the validity of this act. The Tenth Amendment to the Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This act invades the reserved rights of the States, because it attempts to reach and control matters over which the Constitution has given Congress no power. We think that the case of United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 320, 80 L.Ed. 477, 102 A.L.R. 914, decided by the Supreme Court of the United States on January 6, 1936, is conclusive on this point. The statute involved in the Butler Case sought to regulate and control "agricultural production." The statute here, as interpreted in the Executive Orders, seeks to regulate and control "housing," and to "resettle" or shift the destitute and low-income population. of the nation. The court said in the Butler Case that by the Constitution no power "to regulate agricultural production is given, and therefore legislation by Congress for that purpose is forbidden." The Constitution will likewise be scanned in vain for a power conferred upon the federal government to regulate "housing" or to "resettle" population. Those words are not explicit there, nor do we think they are implicit in any power which that instrument confers on Congress; and, unless that power exists, any effort by Congress to assert it at once transcends the scope and limitations of section 8 of article 1 and violates the Tenth Amendment. Hence legislation by Congress for that purpose is forbidden. In other words, such regulation and control of housing and resettlement constitute a prohibited end, and, as was said in the Butler Case, "it is an established principle that the attainment of a prohibited end may not be accomplished under the pretext of the exertion of powers which are granted."

■ In the case at bar the statute is sought to be sustained upon the theory (and it is the only possible theory) that it is an appropriation for the general welfare of the United States. While the power of Congress to tax and spend for the general welfare is broad and sweeping, it is not without restrictions. That power, like all others possessed by Congress, may not be exercised where it conflicts with express limitations imposed by the Constitution. If we concede that under the general welfare clause Congress has the power to appropriate money for relief of unemployment, we have still to consider whether the exercise of that power may be made effective by the establishment of the project here involved. We think that it cannot, not only because by the terms of the act housing is not shown to have any connection with the stated purposes of the act, but also because the projects contemplated by the term "housing" are not means appropriate to the attainment of the end ·declared to be sought—since they have no connection with the general welfare. The obvious limitation of this power is that the welfare be national, but there is another limitation to be considered, and that is that the means employed to attain the end be plainly adapted thereto and be not prohibited. McCul-

loch v. Maryland, 4 Wheat. 316, at page 421, 4 L.Ed. 579. The exercise of the power may not be carried to the extent of imposing taxes or spending revenues for purposes which are exclusively within the province of the States. As was said by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 199, 6 L.Ed. 23: "Taxation is the simple operation of taking small portions from a perpetually accumulating mass, susceptible of almost infinite division; and a power in one to take what is necessary for certain purposes, is not, in its nature, incompatible with a power in another to take what is necessary for other purposes. Congress is authorized to lay and collect taxes, &c., to pay the debts, and provide for the common defence and general welfare of the United States. This does not interfere with the power of the states to tax for the support of their own governments; nor is the exercise of that power by the states, an exercise of any portion of the power that is granted to the United States. In imposing taxes for state purposes, they are not doing what congress is empowered to do. Congress is not empowered to tax for those purposes which are within the exclusive province of the states."

The mere declaration in the statute that it is enacted to meet an emergency or for the general welfare adds nothing to its constitutionality. The courts must look to the terms of the statute in order to determine whether or not its enactment was within the constitutional power of Congress. The argument that the Emergency Relief Appropriation Act of 1935, making the most stupendous single appropriation ever made by a legislative body, was necessary to meet an emergency due to a universal depression and crisis, is not sufficient to expand the power of Congress to tax and spend for purposes exclusively within the reserved powers of the states. As was said by Mr. Justice Roberts in the Butler Case: "It does not help to declare that local conditions throughout the nation have created a situation of national concern; for this is but to say that whenever there is a widespread similarity of local conditions, Congress may ignore constitutional limitations upon its own powers and usurp those reserved to the states."

Thus we think it clear from the limitations placed upon the power of Congress to tax and spend for the general welfare that that power can never be used to destroy the federal balance established by the Constitution between the general government and the States, that that power may be exercised only within the limitations imposed by the Constitution, and not beyond, and that it cannot be directed to matters of local concern which belong exclusively to the States.

The following excerpt from the opinion in the Butler Case seems almost prophetic of the federal government's attempt to "resettle" destitute and low-income families: "Suppose that there are too many garment workers in the large cities; that this results in dislocation of the economic balance. Upon the principle contended for, an excise might be laid on the manufacture of all garments manufactured and the proceeds paid to those manufacturers who agree to remove their plants to cities having not more than a hundred thousand population. *Thus, through the asserted power of taxation, the federal government, against the will of individual states, might completely redistribute the industrial population.*" (Italics supplied.)

If the power involved in the case at bar, viz., the power to *appropriate* or *spend* for the general welfare of the United States, be substituted for the power under discussion in the above excerpt, viz., the power to *tax* for the general welfare of the United States (and one is as broad as the other; one merely complements the other), the Court's rejection of the principle contended for in the Butler Case seems to answer the contention in the case at bar.

In the Butler Case the Supreme Court expressly refrained from determining whether "an appropriation in aid of agriculture" falls within the scope of the phrase "general welfare of the United States," and held that "another principle embedded in our Constitution prohibits the enforcement of the Agricultural Adjustment Act [48 Stat. 31, see 7 U.S.C.A. § 601 et seq.]." The Court continued: "The act invades the reserved rights of the states. It is a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government. The tax, the appropriation of the funds raised, and the direction for their disbursement, are but parts of the plan. They are but means to an unconstitutional end. From the accepted doctrine that the United States is a government of delegated powers, it follows

that those not expressly granted, or reasonably to be implied from such as are conferred, are reserved to the states or to the people. To forestall any suggestion to the contrary, the Tenth Amendment was adopted. The same proposition, otherwise stated, is that powers not granted are prohibited. None to regulate agricultural production is given, and therefore legislation by Congress for that purpose is forbidden. * * * The power of taxation, which is expressly granted, may, of course, be adopted as a means to carry into operation another power also expressly granted. But resort to the taxing power to effectuate an end which is not legitimate, not within the scope of the Constitution, is obviously inadmissible."

While it is true that the government of the United States in the exercise of its sovereignty has jurisdiction over every foot of soil within its territory and acts directly upon its citizens, the exercise of its sovereignty is limited to those powers which are delegated to it by the Constitution, e. g., the power to regulate interstate commerce and the power over the mails. In the exercise of its sovereign power, within the limitations thus imposed, its jurisdiction extends throughout the States and territories, but it must be remembered that, where the exercise of its sovereignty is not justified by any reasonable construction of the Constitution, the United States possesses no power to invade the sovereignty of the States.

■■■ It is urged that the determination of the constitutional question in this case may be avoided by a mere finding that the defendants are acting without legal authority. But to determine whether or not legal authority exists requires an investigation of the fundamental question of whether or not Congress has power to delegate the authority here attempted to be exercised. Following the fallacious contention urged to its logical conclusion, the Supreme Court in the Butler Case could have avoided the determination of the question of constitutionality merely by declaring that Secretary Wallace and his subordinates were acting without authority; and in the Schechter Case that the officers attempting to enforce the illegal codes, provided for in the National Industrial Recovery Act, were acting without authority; and in the Panama Case that the federal officers in Texas, in attempting to enforce the executive orders and regulations there involved, were acting without authority. The mere statement of the contention exposes its fallacy.

The threatened action of the defendants is merely incidental to the execution of the orders of the President, assumed to be authorized by the exercise by Congress of a power which it does not possess. The fundamental question here is not merely whether Congress, in the attempted exercise of its power, failed to exercise it in a manner which would permit of its enforcement. The question is a deeper one. Has Congress, under any circumstances, the constitutional power through legislation to put in operation the proposed Resettlement project? It adds nothing to the force of the act that the President has been designated as the agent of the government to enforce the act. If the power exist, Congress could as well have designated a board or a commission, or Tugwell and his associates directly, thereby obviating any necessity for intervention on the part of the President. The fundamental question involved is the total lack of constitutional power on the part of Congress to put into operation through legislation a project such as is here contemplated; and this can be ascertained, not from any possible determination of fact, but from the very terms of the statute itself.

The judgment is reversed.

GRONER, Associate Justice.

In the view I take of this case at this stage, I am of opinion that we shall have discharged our duty if we reverse the order of dismissal without at this time deciding the constitutionality of the challenged act of Congress. It is enough, I think, to hold now that the bill states a cause within the jurisdiction of the trial court and shows on its face facts justifying the granting of a preliminary injunction. The reason for the dismissal is not shown by the record, and Equity Rule 70½ (28 U.S.C.A. following section 723) was not complied with. I think the facts should be found, as required by that rule, prior to an expression of opinion on the important constitutional questions. This seems to me in conformity with the views expressed by the Supreme Court in Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841; Hammond v. Schappi Bus Line, 275 U.S. 164, 48 S.Ct. 66, 72 L.Ed. 218; Borden's F. P.

Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281; and Wilshire Oil Company v. United States, 295 U.S. 100, 55 S.Ct. 673, 79 L.Ed. 1329. The conclusion reached in the opinion of this court that the question I have just adverted to cannot be affected one way or the other by factual considerations is, I think, not so clear as to justify the course adopted.

I concur in the view that this is not a suit against the United States and that the United States and the property owners who have given options are not indispensable parties, and I am entirely satisfied with the reasoning on this subject in the opinion. I likewise concur in the opinion that some of the parties who brought the suit have a justiciable interest which enables them to invoke the judgment of the court; and I likewise adopt the reasoning on that subject contained in the opinion. But it is conceivable that a trial of the case on the merits may develop a wholly different situation. The motion to dismiss admits the allegations of damage which the threatened invasion of the township's and property owners' rights will occasion. And it is obvious, I think, that these invasions are not merely threatened but are imminent, and therefore within the power of the court, on the allegations in the bill, to restrain pending trial on the merits. But it is not unthinkable that, on a trial, a different state of facts may be shown; and, in that case, the plaintiffs would be, as is true in many other instances since the establishment of the Republic, without means of testing the constitutional validity of the challenged congressional appropriation. This, it seems to me, impels delay in the decision of these questions until the facts are definitely established.

In any case, I think that it is not unlikely that the production of evidence will make clearer the answer to the constitutional questions involved; and, if I am correct in so thinking, then it follows that we ought not to decide these questions in advance of the necessity for doing so, nor to decide them more broadly than the precise facts require. Liverpool, N. Y. & P. S. S. Co. v. Commissioners, 113 U.S. 33, 5 S.Ct. 352, 28 L.Ed. 899.

In what I have said, I wish not to be understood as disagreeing with the conclusions of the court on the constitutional questions discussed. I prefer to reserve my judgment of them, with only the comment that I think the discussion of them now is premature.

I concur in the opinion that the decree of the lower court should be reversed and that the Supreme Court of the District should be directed to overrule the motion to dismiss the bill and to enter a preliminary injunction to remain in effect until the final determination of the cause.

STEPHENS, Associate Justice (dissenting in part, concurring in part).

I dissent from the view of the majority that the court is warranted at this stage of the case in passing upon the constitutional questions and upon the question of authority: The case is not here after a hearing at which proof has been adduced. It is here on appeal from a ruling of the trial court granting a motion to dismiss the bill of complaint. The bill sought a temporary restraining order, a preliminary injunction, and, upon final hearing, a permanent injunction.

Briefly stated, the assertions of the bill are that: Rexford G. Tugwell, Administrator, Resettlement Administration, and John S. Lansill, Director, Suburban Resettlement Division, as officers of the United States, and their agents, have procured, are procuring and will procure revocable offers to sell lands located within the Township of Franklin, in New Jersey, and unless restrained they will accept these offers and will, by moneys furnished through Henry Morgenthau, Jr., Secretary of the Treasury, W. A. Julian, Treasurer, Guy Allen, Chief Disbursing Officer, Disbursements Division, and J. R. McCarl, Comptroller General, as officers of the United States, pay for these lands and take deeds to the same in favor of the United States; thereupon Tugwell, Lansill, and other agents, will construct a "model community" thereon, to consist of single and multiple dwelling houses, and will cause persons of low income from surrounding congested areas and from the immediate neighborhood to tenant such community, induced so to do by the offer of rentals lower than those procurable elsewhere. The rentals will not meet the cost of construction, but operating and maintenance costs only. This project will, by removing from taxation a large portion of the lands within the Township, cause it to suffer losses in revenues; and the project will further interfere with and overburden the governmental func-

tions of the Township, overburden the functions of the Board of Education of the Township, depress the rental value of lands owned by the Township and of lands owned by Margaret C. Alsop, and increase the burden of taxation upon Margaret C. Alsop, Matthew Suydam, Cornelius I. Van Cleef, John W. Martin and Dorothy McC. Brill, all individual petitioners—this again through the removal from taxation of the lands to be purchased and the consequent increase of taxes upon the remaining properties. These activities are being carried on under the Emergency Relief Appropriation Act of 1935[1] which, "in order to provide relief, work relief and to increase employment by providing for useful projects," appropriates funds in the total sum of four billion dollars "to be used in the discretion and under the direction of the President" and to be available for named classes of projects and in certain respective amounts therefor, subject to a 20% reallocation increase by the President if he finds this necessary to effectuate the purposes of the Act. Among the named classes of projects are highways, rural rehabilitation and relief in stricken agricultural areas, water conservation, rural electrification, housing, assistance for educational, professional and clerical persons, Civilian Conservation Corps, loans, or grants, or both, for projects of states, territories, and the like, sanitation, prevention of soil erosion, stream pollution, sea coast erosion, reforestation, forestation, flood control, rivers and harbors, and miscellaneous projects. The Act specifically authorizes the President to acquire real property by purchase or by eminent domain, and to improve, develop, grant, sell, lease or otherwise dispose of the same.

The motion to dismiss, like a demurrer, of course admits the assertions of fact made in the bill, but only for the purpose of testing the validity of the cause of action pleaded and upon the assumption that the assertions of fact can ultimately be proved. Had the motion to dismiss been overruled below, the parties making it, the defendants, could have answered; and should the trial court's dismissal of the bill be reversed on this appeal, the parties defendant will have a right to answer; in such an answer they may deny the assertions of fact made in the bill, including the assertions of in-jury upon which the bill in part is predicated and including the assertions of status which bear upon the capacity of the various complainants to sue. In this event the trial court would be compelled at a hearing to determine the actualities of the case upon proof.

The United States Supreme Court has on more than one occasion ruled that constitutional questions should not be passed upon until it is necessary to pass upon them, and then not until the facts which relate to such questions have been made to appear. In Borden's F. P. Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281—a suit to enjoin enforcement of the New York milk control law on the ground that it was unconstitutional—a cause of action was held to be disclosed in the bill, but the Court sent the case back for trial without passing upon the constitutional question. Speaking for the Court, Chief Justice Hughes said:

"But the case is not before us upon evidence, or upon determinations of fact based on evidence, as the complaint was dismissed solely in the view that it failed to state a cause of action and the motion for injunction accordingly fell without findings being made. As we have said, we may read the complaint in the light of facts of which we may take judicial notice, but if, so read, it may be regarded as sufficient, the decision of this appeal should not turn on other facts which are the proper subjects of evidence and of determinations of fact by the trial court." 293 U.S. 194, at pages 208, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281.

and further:

"But where the legislative action is suitably challenged, and a rational basis for it is predicated upon the particular economic facts of a given trade or industry, which are outside the sphere of judicial notice, these facts are properly the subject of evidence and of findings. With the notable expansion of the scope of governmental regulation, and the consequent assertion of violation of constitutional rights, it is increasingly important that when it becomes necessary for the Court to deal with the facts relating to particular commercial or industrial conditions, they should be presented concretely with appropriate determinations upon evidence, so that conclusions shall not be reached without adequate factual support." 293

---

[1] Act of April 8, 1935, 49 Stat. 115 (15 U.S.C.A. § 728 note).

U.S. 194, at page 210, 55 S.Ct. 187, 192, 79 L.Ed. 281.

In Hammond v. Schappi Bus Line, 275 U.S. 164, at pages 171, 172, 48 S.Ct. 66, 69, 72 L.Ed. 218, a case involving questions of constitutional power and statutory authority, the Court, through Mr. Justice Brandeis held:

"Before any of the questions suggested, which are both novel and of far reaching importance, are passed upon by this court, the facts essential to their decision should be definitely found by the lower courts upon adequate evidence."

In Wilshire Oil Co. v. United States, 295 U.S. 100, 55 S.Ct. 673, 79 L.Ed. 1329, the trial court had granted an interlocutory injunction against the enforcement of the Petroleum Code formulated under the National Industrial Recovery Act; on appeal to the Circuit Court of Appeals (for the Ninth Circuit) the latter certified to the Supreme Court the question whether it had power on appeal from the interlocutory order to decide the question as to the total absence of a cause of action. The Supreme Court, per curiam, dismissed the certificate, but said:

"the Court of Appeals is not bound to decide, upon the allegations of the bill, an important constitutional question, as to which the Court of Appeals is in doubt, in advance of an appropriate determination by the District Court of the facts of the case to which the challenged statute is sought to be applied." 295 U.S. 100, at pages 102, 103, 55 S.Ct. 673, 674, 79 L.Ed. 1329.

I therefore disagree with the view of the majority that it is unnecessary in this case "to trifle with any findings of fact, where no statements of fact could throw additional light * * *" upon constitutional questions, because I think it an unwarranted conclusion that findings of fact could throw no additional light upon the constitutional questions herein involved. On the contrary, I think it demonstrable that findings of fact may throw additional light thereon.

There are three constitutional questions in the case: first, whether the statute under which the activities complained of are being carried on is within the so-called Welfare Clause, article I, § 8, cl. 1, of the Constitution; second, if so, whether the activities complained of are being carried on in a manner which, contrary to the Tenth Amendment, invades the reserved powers of the states; third, whether the statute in question is an invalid delegation of legislative power to the President, contrary to article I, § 1.

With respect to the Welfare Clause: It is made clear in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 319, 80 L.Ed. 477, 102 A.L.R. 914, that whether a statute and activities thereunder are valid within "The necessary implication from the terms of the grant * * * that the public funds may be appropriated 'to provide for the general welfare of the United States'" depends upon whether the purpose is "general, and not local." But it is also made clear that when a contention is made that a statute is in contravention of the fundamental law "we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to Congress. How great is the extent of that range, when the subject is the promotion of the general welfare of the United States, we need hardly remark." In the instant case there would seem to be two inquiries in respect of the Welfare Clause, first, whether general conditions of unemployment and destitution do affect the general welfare, and, if so, second, whether a statute passed "in order to provide relief, work relief and to increase employment by providing for useful projects," as above particularized, including, so far as this case is concerned, housing, is an appropriate means of administering to the general welfare. The answer to each of these inquiries depends upon facts, such as, so far as the first inquiry is concerned, the extent and probable permanence of unemployment and destitution, the probable effects thereof upon the nation through, conceivably, such factors as social disorder, crime, sickness and the like, and such as, so far as the second inquiry is concerned, the need of employment in such industries as furnish materials for housing, and the need and the extent thereof of houses for the destitute. Other facts may aid in one way or another the solution of these two problems. It is not possible to foresee all of the ramifications of pertinent fact involved; it is that very impossibility which makes decision before hearing upon the merits unwarranted.

With respect to the asserted invasion of the reserved powers of the states: Unit-

ed States v. Butler, supra, makes clear that again the answer is dependent upon facts. It was held in that case that Congress, by coercion and purchase, had obtained compliance with a Federal program which it was without power to command. Whether in this case the asserted invasion of the reserved powers of the State of New Jersey by the shifting of its low-income population from one part of the State to another is to be carried on by coercion or purchase, or whether on the other hand the Government is choosing to erect houses usefully rather than uselessly, that is, so that they will serve not only the purpose of providing labor but also of providing homes which will naturally, rather than through coercion and purchase, attract the needy, are matters of fact importantly bearing upon the question of law.

Finally, with respect to the asserted unconstitutional delegation of legislative power: Passing the interesting and important question whether the statute involved is not within a category which presents no question of delegation, and assuming that it is within a category which does present such a question, that question cannot properly be answered, in my opinion, without further facts. Beginning with Cargo of Brig Aurora v. United States, 7 Cranch 382, 3 L.Ed. 378, and ending with Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and through all of the intervening leading cases on delegation,[2] the United States Supreme Court has drawn not a straight line, definitive of the territory between the legislative and executive function, but a variable, the product of two factors, the one the duty of Congress to do its own legislating, and the other the practical necessities in the subject matter and conditions of the legislation. In Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, the Supreme Court, recognizing that:

"Congress manifestly is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is thus vested." 293 U.S. 388, at page 421, 55 S.Ct. 241, 248, 79 L.Ed. 446.
also recognized:

"Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national legislature cannot deal directly. *The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.* But the constant recognition of the necessity and validity of such provisions and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained." (Italics supplied.) 293 U.S. 388, at page 421, 55 S.Ct. 241, 248, 79 L.Ed. 446.

In the series of cases cited, principles, policies and standards have been laid down by Congress varying from extremes of definiteness on the one hand to extremes of indefiniteness on the other. Exemplifying definiteness is Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624, where a statute was upheld empowering and directing the President to increase or decrease duties in such manner as to equalize the difference between the cost of production at home and abroad, but only after investigation by the Tariff Commission as a necessary preliminary to a proclamation changing the duties. Exemplifying indefiniteness is United States v. Grimaud, 220 U.S. 506,

---

2 Wayman v. Southard, 10 Wheat. 1, 6. L.Ed. 253; Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294; Buttfield v. Stranahan, 192 U.S. 470, 24 S. Ct. 349, 48 L.Ed. 525; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L. Ed. 563; Mutual Film Corp. v. Ohio Industrial Commission. 236 U.S. 230. 35 S. Ct. 387, 59 L.Ed. 552, Ann.Cas.1916C, 296; Mahler v. Eby, 264 U.S. 32, 44 S. Ct. 283, 68 L.Ed. 549; Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 69 L. Ed. 202; Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L. Ed. 446.

31 S.Ct. 480, 55 L.Ed. 563, sustaining a statute authorizing the Secretary of Agriculture to make such rules and regulations as would insure the objects of forest reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction. This recognition by the Supreme Court of the validity of legislation announcing principles, policies and standards varying in respect of definiteness, and the statement of the general principle above quoted from Panama Refining Co. v. Ryan, make clear, I think, that the proper and necessary limits of legislative exactness cannot be determined by courts without knowledge of the subject matter and conditions of the legislation. In the instant case, still assuming that the statute is within a category presenting a question of delegation, whether Congress could specify with greater definiteness than it did by the word "housing" what kind of structures should be erected for the relief of unemployment and to provide homes for the needy, and whether Congress could specify with greater definiteness where such structures should be erected, depend upon conditions which would vary as to locality and change with time.

With respect to the Welfare Clause and the reserved powers of the states, facts cannot, of course, create or enlarge Federal power. Neither can they diminish nor obliterate it. But they may call for its exercise and they may affect the manner of its exercise. With respect to delegation, that is, the duty of Congress itself to legislate, facts cannot relieve it from that duty. Neither can they prevent it from performing the same. I do not assume to pass upon the effect upon the constitutional questions herein of such facts as are above suggested, and I do not assume now to pass upon those questions. I assert merely that to pass upon them without proof of the facts is to render an opinion in the abstract, in effect an advisory opinion.

With respect to the question of authority: The majority opinion, I think, fails to differentiate between that question and the question of delegation. The latter has to do with the validity of the statute; the former with whether or not the acts which are being done under the statute were contemplated. by its language. I think that on the question of authority also there should be no ruling until the facts are proved.[3] The assertions of the bill and the conclusions of the majority on the question of authority are in effect that the activities being carried on under the Executive Order setting up the Resettlement Administration and defining its powers and duties are beyond the purview of the statute, so that the President has assumed power. Before so sweeping a conclusion is reached, I think the court should be informed by proof— not merely by the bill—as to·what the President and his agents are doing.[4] Moreover, whether the actual activities of the Resettlement Administration are within the language of the statute may again depend upon the conditions of the legislation. Congress may be taken to have intended useful housing projects, and whether they could be useful without erection in such localities as would make tenancy likely is a question of fact.

With respect to the topics of capacity to sue and cause of action in the respective complainants: I disagree with the conclusion of the majority that the Township has a proprietary interest which will enable it to maintain a suit, to wit, as the owner of real property which it leases to a private individual and the rental value of which is threatened with impairment. The majority has reached the conclusion, with which I agree, that complainant Margaret C. Alsop has no cause of action for threatened impairment of the rental value of her land. This conclusion is based upon the proposition that the case stated for her is one merely of *damnum absque injuria,* this upon the faith of New Orleans, M. & T. Railroad Co. v. Ellerman, 105 U.S. 166, 26 L.Ed. 1015, and United States v. Dern, 63 App.D.C. 28, 68 F.(2d) 773, certiorari denied 292 U.S. 642, 54 S.Ct. 776, 78 L.Ed. 1494. I am unable to understand how the majority reaches the conclusion that threatened impairment of the rental value of an in-

---

[3] The reliance in the majority opinion upon United States v. Butler, Panama Refining Co. v. Ryan and Schechter Poultry Corp. v. United States, supra, as warranting this court in passing now upon the constitutional questions is, I think, not well founded. All of those cases had been heard below on the merits.

[4] This is not to cast doubt upon the good faith of the assertions in the bill. But facts cannot always be set forth in advance of proof with accuracy.

dividual's property is *damnum absque injuria,* and at the same time concludes that threatened impairment of the rental value of the Township's property, held in a proprietary capacity, is *damnum atque injuria.*

Upon the assumption that the facts alleged can be proved, and that the acts of the defendants are without constitutional validity or statutory authority, I agree with the conclusion of the majority that the Township has capacity to sue and states a cause of action with reference to interference with its governmental functions. It is true that In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092, holds merely that the United States may invoke the powers of a court of equity to protect the exercise of its governmental functions. But the principle and language of the case make it applicable to any government. The remaining question as to whether or not the Township can proceed for itself, that is, rather than the State of New Jersey for it, is, I think, sufficiently answered by the New Jersey cases: Township of Landis v. Millville Gas Light Co., 72 N.J.Eq. 347, 65 A. 716; Easton & Amboy R. Co. v. Inhabitants of Greenwich Tp., 25 N.J.Eq. 565; Mayor and Council of Seabright v. Allgor, 69 N.J.Law 641, 56 A. 287. These authorities recognize that in New Jersey a township has authority to bring suit in protection of its own functions. If it has thus capacity to sue at all, I think there is no rule of law which will prevent its suing outside New Jersey. It is a municipal corporation, an entity recognized by law, and presumptively the courts are everywhere open to it. Since it is thus held that there is a cause of action stated in the Township with reference to its governmental functions, I think it unnecessary to pass upon the question whether there is a cause of action stated in the Township for loss of revenues which would have arisen from lands heretofore assessed but which are to be the subject of title in the Government and therefore not subject to taxation. I think it clear, however, that no cause of action is stated in the Township in respect of increased expense in the carrying on of its governmental functions, this for lack of an allegation that such expense cannot be covered by an increased rate of taxation. Florida v. Mellon, 273 U.S. 12, 47 S.Ct. 265, 71 L.Ed. 511.

I agree with the conclusion of the majority that the Board of Education states no cause of action for protection of its governmental functions. No authorities are adduced indicating that in New Jersey a Board of Education, as distinguished from a township, has authority to sue. There is, furthermore, lacking any allegation in respect of the Board of Education that the asserted (it is upon this that it predicates its cause) impending loss of a large portion of the sources of its revenue cannot be made up by an increased tax rate in the Township.

Upon the assumptions above specified, I agree with the conclusion of the majority that a cause of action is stated in each individual taxpayer complainant for threatened increase in his tax burden. Crampton v. Zabriskie, 101 U.S. 601, 25 L.Ed. 1070, and Mayor and City Council of Baltimore v. Employers' Ass'n of Md., 162 Md. 124, 159 A. 267, sufficiently recognize, I think, the right of a taxpayer to take proceedings to prevent wrongful acts which will increase his tax burden. I think the facts asserted in the instant case distinguish it from Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078, holding that a taxpayer of the United States may not question expenditures from the Treasury on the ground that the alleged unlawful diversion will deplete the public funds and thus increase the burden of further taxation, this for the reason that his asserted injury, shared with all other taxpayers, is comparatively minute and indeterminable. In the instant case the individual taxpayer sues not primarily to question the legality of expenditures from the Federal Treasury but to enjoin a threatened step in an allegedly unconstitutional program, from which, in common only with other taxpayers in the Township, he will, it is asserted, suffer an increased tax burden.

I agree with the conclusion of the majority that those who are asserted to have given revocable options for purchases of land are not necessary parties. I think that the interest of a prospective seller, like that of a prospective purchaser, is too remote. Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183; Rorick v. Board of Com'rs of Everglades Drainage Dist. (D.C.) 27 F.(2d) 377.

I agree also with the conclusion of the majority that the United States is not a necessary party. I think this point is controlled by the principle actuating the decisions in: Payne v. Central Pac. Ry. Co., 255 U.S. 228, 41 S.Ct. 314, 65 L.Ed. 598; Northern Pac. Ry. Co. v. North Dakota, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897; Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755; Lane v. Watts, 234 U.S. 525, 34 S.Ct. 965, 58 L.Ed. 1440; United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171; Transcontinental & Western Air v. Farley (C.C.A.) 71 F.(2d) 288, certiorari denied, 293 U.S. 603, 55 S.Ct. 119, 79 L.Ed. 695. These cases, each brought upon the theory that Government officers were acting without power and holding in the Northern Pac. Ry. Co., the Lee, the Payne, and the Lane Cases, the United States not a necessary party, and in the Farley and Roper Cases, a necessary party, are in my opinion, clearly explainable, as follows: Where a plaintiff asserts that an officer of the Government is acting without power and that therefore his acts are invalid, the court in determining the preliminary jurisdictional question whether the United States is a necessary party (whether necessary parties are before a court is, of course, jurisdictional), is confronted with a peculiar procedural problem, or impasse, arising out of the fact that the determination of this question involves passing upon the very question involved in the merits. For example, in the Northern Pac. Ry. Co. Case, brought to restrain the Director General of Railroads, who had imposed a schedule of intrastate rates, from enforcing the same, upon the ground that he had no power except respecting interstate rates, the question arose at the threshold whether the United States was a necessary party. Necessary parties are those "affected by the judgment and against which in fact it will operate. * * *" Minnesota v. Hitchcock, 185 U.S. 373, 387, 22 S.Ct. 650, 655, 46 L.Ed. 954. If the Director General had no power over intrastate rates, then the United States was not a necessary party because it had nothing to do with the imposition and enforcement thereof, and a judgment restraining the effectiveness of the schedule would operate only against the Director General individually. If, on the contrary, the Director General had power over intrastate rates, then the United States was responsible for his impos-

ing and enforcing the schedule and the judgment would operate against it. Thus the ultimate question was also the jurisdictional question. A similar problem was presented in each case of the group mentioned. Since a court must determine at the outset its jurisdiction to proceed, it is compelled to make a preliminary decision for jurisdictional purposes on the ultimate question in the suit, and this notwithstanding the fact that when the merits are heard, it may be compelled to reach an opposite conclusion. The courts solve this problem by accepting at their face value, for jurisdictional purposes, the assertions of the complainant of want of power in the officers—unless such assertions are "so unsubstantial and frivolous as to afford no basis for jurisdiction * * *,"[5] and by giving the assertions thus accepted their natural jurisdictional consequences in respect of who are necessary parties. Thus in the Northern Pac. Ry. Co. Case the Court, to determine whether the United States was a necessary party, accepted as true the assertions of want of power in the Director General, and thereupon held that the United States was not a necessary party, and this although when the merits were passed on, the Court reached the conclusion that the Director General did have power to impose and enforce the local rates. Again in United States v. Lee, the Court accepted for jurisdictional purposes the assertions of the plaintiff that the officers holding the Lee property for the Government were without power so to do, and thereupon held the Government not a necessary party. In this instance the jurisdictional holding coincided with the ultimate holding. A similar result for the same reason was reached in the Payne and Lane Cases. In the Farley Case the same jurisdictional method resulted in holding the Government a necessary party. The assertions were that Farley was without power to cancel airmail contracts which had been entered into between the United States and the complainant. Accepting this assertion at face value for jurisdictional purposes, the consequence was that if Farley was without power to cancel, the Government was bound to perform; therefore, it was a necessary party, and it was so held. Again in the Roper Case the same result was reached on similar facts and for the same reason. Applying this principle of solution of the preliminary jurisdictional prob-

---

[5] Northern Pac. Ry. Co. v. North Dakota. 250 U.S. 135, 152, 39 S.Ct. 502, 63 L.Ed. 897.

lem to the instant case: It cannot be said that the assertions of want of power in the officers to acquire lands for the Government are "so unsubstantial and frivolous as to afford no basis for jurisdiction. * * *" Accepting them, therefore, for preliminary jurisdictional purposes only, as true, it follows that the Government is without interest in the proposed purchases of land and therefore not a necessary party. This jurisdictional decision is reached quite without reference to the ultimate decision, on the merits, of the very same question of want of power in the officers.

I conclude, therefore, that the case should be returned to the trial court for a hearing on the merits so that proof may be had on all aspects of the case, on the constitutional questions as well as on the assertions of fact which underlie the capacity of the complainants to sue and the cause of action especially asserted in each. I think that during such hearing the *status quo* ought to be preserved by a temporary injunction as we have preserved it here by such an injunction pending determination of this appeal.

I assume the majority opinion contemplates a right in the defendants to answer in the court below and a hearing there upon the questions of fact other than those relating to the constitutional points, that is to say, a hearing upon the issues of fact relating to the capacity of the complainants to sue and the injury asserted. I think that during such a hearing the *status quo* should be preserved by a temporary injunction.