ICKES, Secretary of the Interior, v. FOX et ux.*

SAME v. PARKS et ux.

SAME v. OTTMULLER.

Nos. 6541–6543.

United States Court of Appeals for the District of Columbia.

Decided June 8, 1936.

Nathan R. Margold, of Washington, D. C., Frederick Bernays Wiener, of Providence, R. I., and Jackson E. Price, of Washington, D. C., for appellants.

Preston B. Kavanagh and P. C. King, Jr., of Washington, D. C., and Stephen E. Chaffee, of Sunnyside, Wash., for appellees.

*Writ of certiorari granted 57 S. Ct. 36, 81 L. Ed. —.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

VAN ORSDEL, Associate Justice.

These are three special appeals by the Secretary of the Interior, Harold L. Ickes, from orders of the Supreme Court of the District of Columbia denying his motions to dismiss amended bills in equity brought by appellees, plaintiffs below, to restrain the defendant Ickes, as Secretary of the Interior, from the enforcement of certain public notices issued by his predecessor in office, Ray Lyman Wilbur, limiting plaintiffs' water right appropriations in the Sunnyside Unit of Yakima Project, a Federal Reclamation Project in the State of Washington, to an amount of water much less than the rights and privileges which plaintiffs enjoyed prior to the promulgation of the notices and orders in question.

Pursuant to the terms of the Reclamation Act of June 17, 1902, 32 Stat. 388, as amended, U.S.C., tit. 43, c. 12, the United States undertook the construction and operation of the Yakima Project. Acting under the law, the United States purchased from the Washington Irrigation Company the Sunnyside Canal, water appropriations and irrigation system used in connection therewith. In addition to the rights thus procured, the United States secured appropriations from the Yakima river system, pursuant however to the express provisions therefor in the laws of the state of Washington, and provided storage for the waters thus appropriated from the state in reservoirs constructed, owned, and operated by the United States. Plaintiffs were appropriators and owners of water rights in the Sunnyside Canal from the Washington Irrigation Company long prior to its purchase by the United States. Plaintiffs were required by the government, as a condition of procuring water for irrigation of their lands, to execute and deliver to the United States certain water-right obligations. In consideration of procuring these rights, plaintiffs were required to pay to the government of the United States "the sum of $10.00 per acre for the benefits to be derived from said project of the United States," which amount it is alleged has been fully paid and any claims therefor from the government, or liens thereunder, have been fully satisfied and discharged.

It is important at this point to ascertain the nature of the water rights pur-chased from the United States by plaintiffs or their predecessors as stated in the several applications. In the Fox case: "The measure of the water right for said land is that quantity of water which shall be beneficially used for the irrigation thereof, but in no case exceeding the share proportionate to irrigable acreage, of the water supply actually available as determined by the project manager or other proper officer of the United States, or of its successors in control of the project, during the irrigation season for the irrigation of lands under said unit." In the Parks case the measure of the water right purchased is fixed in the application as follows: "The amount of water to be furnished hereunder shall be three (3) acre-feet of water per annum per acre measured at the land, or as much more water as will be required to successfully irrigate the land, the amount so required to be determined by the authorized agent of the United States, and the water shall be used only to irrigate said lands and for domestic purposes incident thereto; provided, that the amount of water furnished shall be limited to the amount beneficially used upon such lands." In the Ottmuller case the water right application provided: "The quantity of water to be furnished thereto shall be three (3) acre-feet of water per annum per acre of irrigable land as aforesaid, measured at the land; or so much thereof as did constitute the proportionate share per acre from the water supply actually available for the lands under said project; provided, that the supply furnished shall be limited to the amount of water beneficially used on said irrigable land."

Plaintiffs, in their amended bills of complaint, base their rights to the use of water primarily on the rights acquired by them or their predecessors by purchase from the Washington Irrigation Company, under which it is alleged there was furnished by the company and beneficially used upon the lands in question; In the case of Parks, 6 acre feet of water per acre per annum; in the case of Ottmuller, 5.56 acre feet of water per acre per annum; and in the case of Fox, 4.84 acre feet of water per acre per annum; which rights under the laws of the state of Washington became appurtenant to the lands and is real estate. Rem.Rev.Stat.Wash. § 7391.

It is alleged by the plaintiffs in their respective bills that the United States com-

pleted the construction of the irrigation unit, constructed reservoirs of sufficient capacity to beneficially and successfully irrigate all lands within said unit, and a determination had been made that the respective amounts originally acquired by the plaintiffs of water per acre per annum was necessary to beneficially and successfully irrigate the lands, and after the delivery of the water for several years and its beneficial use Congress passed an act (38 Stat. 687, § 4, 43 U.S.C.A. § 469) providing: "No increase in the construction charges shall, after August 13, 1914, be made, after the same have been fixed by public notice, except by agreement between the Secretary of the Interior and a majority of the water-right applicants and entrymen to be affected by such increase." This restriction was confirmed on September 24, 1914, by Franklin K. Lane, then Secretary, in a public notice, as follows: "The amount of the construction charge per irrigable acre for lands for which entry under the provisions of the Reclamation Act of June 17, 1902 (32 Stat. 388), or water-right application has heretofore been made, shall be the amount fixed in the several public notices heretofore issued for the respective lands and therein termed 'the building charge' and will not be increased, except as provided in said Reclamation Extension Act."

The statute law of the state of Washington provides: "The right to the use of water which has been applied to a beneficial use in the state shall be and remain appurtenant to the land or place upon which the same is used." Rem.Rev.Stat. § 7391. In view of this statute the successive Secretaries of the Interior construed the contracts as conveying to each purchaser a sufficient amount of water to beneficially and successfully irrigate his land. Indeed, this was imperative under section 8 of the Reclamation Act (43 U.S.C.A. § 372), which provides: "The right to the use of water acquired under the provisions of the reclamation law shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

It is alleged that "it was determined by the successive Secretaries of the Interior, their representatives, and their subordinates"; that in the case of Parks 6 feet of water per acre per annum, in the case of Ottmuller 5.56 feet, and in the case of Fox 4.84 acre feet, "was necessary to beneficially and successfully irrigate said land; that pursuant to said practical construction and determination the successive Secretaries of the Interior, their representatives and subordinates, have for a period of more than 20 years, delivered to said land the amount of water necessary to beneficially and successfully irrigate the same, which water has at all times been beneficially used thereon for irrigation purposes."

It is alleged that in the year 1930, Elwood Mead, Commissioner of Reclamation of the United States, recommended the construction of the Cle Elum Reservoirs at a cost of $3,500,000 for the purpose of storing water for the irrigation of lands in Kittitas Reclamation District, and also for the purpose of supplying water for the irrigation of lands in the Roza and Kennewick Divisions of the Yakima Project. Mead, it is alleged, ascertained that the cost of the reservoir would be $1,000,000 more than the amount that would be returned to the reclamation fund from these divisions. It was necessary, therefore, before the commencement of reservoir construction that a source should be ascertained from which the $1,000,000 could be obtained. It is alleged that Mead accordingly "without consulting these plaintiffs or other water users in said unit in said District, charged the sum of $1,000,000 to said unit in said District and furnished the Secretary of the Interior information that provision had been made for the payment by said unit of said sum."

It is also alleged that thereafter Mead and one Stoutemyer, District Counsel, and Secretary Wilbur, in order to compel the plaintiffs and other water users to contract to pay the sum of $1,000,000, caused the Assistant Secretary of the Interior on October 17, 1930, to issue an order which, among other things, provided:

"The water applications and water-right contracts which determine the limit of the individual water rights in the Sunnyside Valley Irrigation District provided in most cases—

"(A) For the delivery of three (3) acre-feet of water or so much thereof as is necessary for beneficial use in years of ordinary run-off in the Yakima River, with a provision for pro rata reduction in years of unusual drought or low water.

"(B) Some of such applications or contracts provide for delivery of 3 acre-feet subject to a proviso 'that the amount of

water furnished shall be limited to the amount beneficially used upon said lands'.

"(C) Still other applications or contracts provide for the delivery of 3 acrefeet per annum per acre, 'or as much more water as will be required to successfully irrigate the land, the amount so required to be determined by the authorized agent of the United States', and subject to the proviso 'that the amount of water furnished shall be limited to the amount beneficially used upon such lands', and the further provision 'that the United States shall not be responsible for the failure to supply water under this contract caused by insufficient supply of water in the Yakima River, due to hostile diversion or unusual drought'."

After a statement by the Assistant Secretary on the economical use of water for irrigation to avoid waste, and the additional storage capacities that would be supplied, and the statement that heretofore due to the fact that the Kittitas division of the Yakima project had not been completed, it had been possible to permit water users in the Sunnyside Valley Irrigation District to use water in excess of amounts specified in their contracts and applications, it was ordered: "In order that all water users in the Sunnyside Valley Irrigation District may know in advance that economy in the use of water will hereafter be necessary, and be prepared to take care of the water and use it to the best advantage, notice is hereby given that as to all lands except those above referred to in paragraph (C), during the year 1931 and subsequent years, until further notice, water deliveries in that district will be limited to three (3) acre-feet per irrigable acre per year, as specified in the said contracts and applications, except in years of unusual drought or low water, when it will be necessary to limit deliveries to a somewhat smaller amount as provided for in said contracts applicable to the lands of the District; provided, however, that so long as there is surplus stored water available not required to meet contract obligations to the United States to other parties, water in excess of three acre-feet may be rented by water users of the Sunnyside Valley Irrigation District of the classes referred to above as 'A' and 'B' whose rights are limited under their applications and contracts to 3 acre-feet. The water-rental charge for such extra water in excess of 3 acre-feet, used during the irrigation sea-

son of 1931, will be one dollar and fifty cents ($1.50) per acre-foot, and the rental rate will be announced annually for subsequent seasons. All money collected for the rental of such extra water will be applied toward the payment of the unsecured portion of the construction costs of the reservoir system of the Yakima project."

A further notice and order was given by the First Assistant Secretary of the Interior on May 5, 1932, in which a classification of the lands was made as those entitled to 3 acre feet per acre, 3.5 acre feet per acre, and 4 acre feet per acre. This classification was made by one W. W. Johnson in a report of February 1932. It was then ordered that water users under these various classifications "except in years of unusual drought or low water, when water deliveries to said lands may be limited to less than the quantities herein designated, the amount indicated for that class will constitute the required water deliveries to said land"; and that water deliveries beginning with the irrigation season of 1932 "in excess of the above determined quantity per acre, will be suggested to water-rental charges at rates established in public notice for the irrigation season of 1932 and in subsequent public notices."

These orders amounted to notice to Fox and Ottmuller that they would be deprived of all water rights in excess of three acre feet of water per annum, and that Parks would likewise be deprived of all water rights in excess of 3½ acre feet per annum, unless plaintiffs would sign a new water rental application which they, together with all other water-rights applicants, refused to sign. This application provided as follows: "The undersigned applicant requests excess water under public notice issued by the Secretary February 19, 1932, and agrees to pay applicable charges, with 6% interest from December 1, 1932, until paid. He further agrees that water may be withheld from his land after 1932 until such charges are paid. It is understood that advance payment for excess water will be required in 1933, if the 1932 rental charge remains unpaid at that time."

We are confronted again by the usual contention that this is a suit against the United States, and as such cannot be maintained. This is urged on the theory that the action is one to require the specific performance of a contract with the United

States. This is not an action for specific performance. It is an action to restrain the Secretary of the Interior from enforcing the alleged illegal orders issued by that officer and his predecessor in office in his capacity as the administrative agent of the government for the construction of irrigation works and the disposition of the same under the Reclamation Act (38 Stat. 690, § 15, 43 U.S.C.A. § 373). The suit, therefore, is one against an agent of the government and not against the government itself, since no complaint is here made by the plaintiffs of the existing contracts between them and the government. The validity of the contracts between the government and the plaintiffs is not here in issue. The question is whether or not the orders promulgated amount to a valid and enforceable extension of the terms of the contract. If not the orders will be determined as unenforceable and the contracts will remain valid as if the orders had never been issued.

This brings us to the consideration of the authority of the Secretary to issue the orders here in question. The water rights here involved were primarily derived through the contracts of the plaintiffs or their predecessors with the Washington Irrigation Company. Under that authority, and in conformity with the laws of the state of Washington, the plaintiffs acquired sufficient water, beneficially used, to irrigate their lands, and these rights were not subsequently modified to any extent by the contracts entered into with the government after the government had acquired the rights of the Washington Irrigation Company. While in two of the contracts here in question the amount is fixed at 3 and one at 3½ feet per acre, this seems to have been put in as a minimum amount, since there was a further qualification permitting of the use of sufficient water to beneficially and successfully irrigate their lands. This is the legal measure of right to use fixed by the laws of the state of Washington and by the Reclamation Act. This amount had been fixed through prior application and use of the water at 6 feet per acre in the case of Parks, 4.84 feet per acre in the case of Fox, and 5.56 feet per acre in the case of Ottmuller. This amount was found to be necessary to beneficially and successfully irrigate the land; and under section 7391, Rem.Rev.Stat. of Washington, "the right to the use of water which has been applied to a beneficial use in the state shall be and remain appurtenant

to the land or place upon which the same is used."

Under the Reclamation Act the United States, in putting in an irrigation enterprise, stands in the same position with relation to the state as a private individual. The waters belong to the state, and the United States never acquires any title therein any more than a private appropriator.

It is settled irrigation law that mere diversion and storage of water does not constitute an appropriation. Before there can be an appropriation the water must be applied to a beneficial use. Highland Ditch Company v. Union Reservoir Company, 53 Colo. 483, 127 P. 1025. In Pioneer Irrigation D. Co. v. Board of Commissioners (D.C.) 236 F. 790, the court, considering constitutional and statutory provisions similar to those of the state of Washington, held that under the Constitution and statute relating to water rights, as construed by the Supreme Court of the State, no property right can be acquired in the use of water until it is applied to a beneficial use. The owner of the carrying ditch gets no title or right to the use of the water and has no property in it subject to disposal, but such property right of disposal is in him who applies the water to beneficial use.

It is clear, therefore, that the United States under the proceedings provided in the Reclamation Act acquires no title to the water. It is merely a carrier and distributor of the water, and the only title acquired which consists only of a right of use is in the appropriator who applies the water to a beneficial use. To proceed under the Reclamation Act the United States must make application for a permit to appropriate the waters and to distribute it for beneficial purposes. The state does not surrender its right to control its use. The 1,000 cubic feet appropriated in 1891 was appropriated by the application of the water to beneficial use, and under such circumstances the water becomes a part and parcel of the land and is appurtenant thereto. This rule was recognized in the Reclamation Act (43 U.S.C.A. § 372), where it is specifically provided that the water right is appurtenant to the lands irrigated.

Secretary Garfield in 1909, pursuant to Reclamation Act 1902, § 4, 43 U.S.C.A. § 419, made a finding as to the cost of the

irrigation system in addition to the purchase price paid the Washington Irrigation Company, and fixed the price at $52 per acre, which sum would return to the reclamation fund the total cost of the project. A public notice and order was issued fixing this charge. It is alleged that under the administration of the Reclamation Act prior to the action of Mead and Wilbur and the orders here complained of, the Reclamation Act was construed, and the contracts made thereunder were construed, as holding that water users were entitled to a sufficient amount of water to beneficially and successfully irrigate their lands; and that it was determined by successive Secretaries that 4.84 feet per annum was necessary for the Fox land, 5.56 feet for the Ottmuller land, and 6 feet for the Parks land, to beneficially and successfully irrigate the same. In accordance with these ascertained facts, Congress passed the Reclamation Extension Act of August 13, 1914, which, among other things, provides: "No increase in the construction charges shall, after August 13, 1914, be made, after the same have been fixed by public notice, except by agreement between the Secretary of the Interior and a majority of the water-right applicants and entrymen to be affected by such increase." 38 Stat. 687, § 4, 43 U.S.C.A. § 469.

Pursuant to this act, Franklin K. Lane, then Secretary of the Interior, on September 24, 1914, issued a public notice and order as follows: "The amount of the construction charge per irrigable acre for lands for which entry under the provisions of the Reclamation Act of June 17, 1902 (32 Stat. 388), where water-right application has heretofore been made, shall be the amount fixed in the several public notices heretofore issued for the respective lands and therein termed 'the building charge', and will not be increased, except as provided in said Reclamation Extension Act." It is alleged in substance that the Sunnyside Irrigation District was organized in 1918, and a contract was entered into with the United States under which the District assumed and agreed to pay construction charges to the extent of $2,000,000 and all obligation and maintenance charges. In pursuance of 43 U.S.C.A. § 512, the Secretary released all liens on the lands of said unit for construction, operation, and maintenance charges.

The court below was right in overruling the motions to dismiss the bills of the respective plaintiffs, and the order denying the motions is affirmed.

STEPHENS, Associate Justice (dissenting).

In my opinion the United States is a necessary party to these suits; and since it has not consented to be sued, they cannot proceed. Necessary parties are those "affected by the judgment and against which in fact it will operate. * * *" Minnesota v. Hitchcock, 185 U.S. 373, 387, 22 S.Ct. 650, 655, 46 L.Ed. 954. Whether or not title to the water in question is in the United States, the latter is a party to contracts to deliver water. If the asserted reductions made by United States officials in the amounts of water to be delivered under the contracts were illegal, then the United States is bound to deliver the former amounts. If the reductions are legal, it is not so bound and may therefore, for a consideration valuable to itself, contract for delivery of the difference to the plaintiffs, if they desire it, or to third parties. The point is, in my opinion, controlled by the principle actuating the decisions in: Payne v. Central Pac. Ry. Co., 255 U.S. 228, 41 S.Ct. 314, 65 L. Ed. 598; Northern Pac. Ry. Co. v. North Dakota, 250 U.S. 135, 39 S.Ct. 502, 63 L. Ed. 897; Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755; Lane v. Watts, 234 U.S. 525, 34 S.Ct. 965, 58 L.Ed. 1440; United States v. Lee, 106 U.S. 196, 1 S. Ct. 240, 27 L.Ed. 171; Transcontinental & Western Air v. Farley (C.C.A.) 71 F. (2d) 288, certiorari denied, 293 U.S. 603, 55 S.Ct. 119, 79 L.Ed. 695. This principle and the application thereof I discussed in my separate opinion in Township of Franklin et al. v. Rexford G. Tugwell et al., decided by this court May 18, 1936, 66 App. D.C. 42, 85 F.(2d) 208. In respect of the situation here involved, I think Wells v. Roper and Transcontinental & Western Air v. Farley are in point and controlling.