225 P.2d 1007

**STATE ex rel. BLISS v. DORITY et al.**

No. 5296.

Supreme Court of New Mexico.

Dec. 22, 1950.

Caswell S. Neal, Carlsbad, for appellants.

Joseph O. Walton, Special Asst. Atty. Gen., Atwood, Malone & Campbell, Roswell, for appellee.

BRICE, Chief Justice.

The State of New Mexico, upon relation of its State Engineer John H. Bliss, brought separate suits against Bert Troy Dority, Loman Wiley and S. A. Lanning, Jr., the purpose of which was to enjoin the respective defendants from unlawfully using for irrigating lands, waters drawn from what is known as the Roswell Artesian Basin, and the valley fill above it, which plaintiff asserts under Ch. 131, N.M.L. 1931, 1941 Comp. § 77-1101 et seq., are subject to appropriation as provided therein.

These three suits were consolidated in the district court for all purposes and are here on appeal from a decree of the district court enjoining each of the defendants from using unappropriated water for the irrigation of land, in violation of the New Mexico statutes.

Defendants' lands are situated in Chaves County, New Mexico, and are located within the external boundaries of two underground water sources, one of which is an artesian basin lying between confining strata, the waters of which are commonly referred to as artesian water; and the other, plaintiff asserts, is an underground reservoir or lake in the valley fill overlying such artesian basin, the waters of which are commonly referred to as shallow ground water. About 45,000 acres are irrigated from shallow ground water and 55,000 acres from artesian water.

Each of the defendants, Lanning and Dority, is the owner of a permit authorizing him to use water for irrigating a portion of his lands; but the plaintiff asserts that the defendant Dority is irrigating 96.7 acres of land illegally, in that he has not been granted the right to so use the water; that the defendant Wiley was in like manner illegally using water to irrigate 48.7 acres of land; and the defendant Lanning was illegally using water to irrigate 120 acres. The defendants admit that they have been using, and will continue to use, the water without a permit unless enjoined from so doing. They deny that their use of it is in violation of law. The principal contention is that the New Mexico statutes providing for the appropriation of sub-surface water is unconstitutional upon several grounds stated.

The statutes of New Mexico declaring that the artesian and shallow ground water from which defendants obtained the water to irrigate their land belongs to the public and providing for their appropriation for beneficial use, are as follows:

"The waters of underground streams, channels, artesian basins, reservoirs, or lakes, having reasonably ascertainable boundaries, are hereby declared to be public waters and to belong to the public and to be subject to appropriation for beneficial use." Sec. 77-1101, N.M.Sts.1941.

"Beneficial use is the basis, the measure and the limit to the right to the use of the waters described in this act." Sec. 77-1102, N.M.Sts.1941.

"Any person, firm or corporation desiring to appropriate for irrigation or industrial uses any of the waters described in this act shall make application to the state engineer in a form to be prescribed by him in which said applicant shall designate the particular underground stream, channel, artesian basin, reservoir or lake from which water is proposed to be appropriated, the beneficial use to which it is proposed to apply such

water, the location of the proposed well, the name of the owner of the land on which such well will be located, the amount of water applied for, the use for which it is desired and if the proposed use is irrigation, the description of the land to be irrigated and the name of the owner thereof. (Then follows a provision for the publication of notice of any objections to granting the permit, a provision that such application should be granted if there are any waters subject to appropriation, and the manner of hearing protests on such application, if any.)" Sec. 77-1103, N.M.Sts.1941.

"Existing water rights based upon application to beneficial use are hereby recognized. Nothing herein contained is intended to impair the same or to disturb the priorities thereof." Sec. 77-1104, N.M.Sts. 1941.

"Any person, firm or corporation claiming to be the owner of a vested water right from any of the underground sources in this act described, by application of waters therefrom to beneficial use, may make and file in the office of the state engineer a declaration in a form to be prescribed by the state engineer setting forth the beneficial use to which said water has been applied, the date of first application to beneficial use, the continuity thereof, the location of the well and if such water has been used for irrigation purposes, the description of the land upon which such water has been so used and the name of the owner thereof. (Then follows provision for verification of the declaration, and the recording thereof.)" Sec. 77-1105, N.M.Sts.1941.

"Declarations heretofore filed in substantial compliance with section 5 (§ 77-1105) hereof shall be recognized as of the same force and effect as if filed after the taking effect of this act." Sec. 77-1106, N.M.Sts. 1941.

"The decision of the state engineer shall be final in all cases unless appeal be taken to the district court within thirty (30) days after his decision as provided by section 151-173 of the 1929 New Mexico Statutes Annotated (§ 77-601)." Sec. 77-1110, N.M. Sts.1941.

"The state engineer is hereby given the power and it is made his duty to formulate rules and regulations for the purpose of carrying out the provisions of act, which rules and regulations shall be printed and made available for distribution to all applicants." Sec. 77-1111, N.M.Sts. 1941.

"Any person using or appropriating water without a permit, contrary to the provisions of section 1 of chapter 70, of the New Mexico Session Laws of 1943, designated as section 77-1103 of the New Mexico Statutes, 1941, Annotated; or who changes the location of his well or use of the water except as provided and permitted by section 77-1107 of said New Mexico Statutes, 1941, Annotated; or who appropriates to his own

use without a permit from the state engineer forfeited water or water rights under the provisions of section 77-1108 of said New Mexico Statutes, 1941, Annotated, shall be guilty of a misdemeanor and, on conviction thereof in any court of competent jurisdiction, shall be punished * * *." Laws 1943, Ch. 70, Sec. 2; Laws 1947, Ch. 21, Sec. 1, Sec. 77-1112, N.M.Sts.1941.

The appellants' first contention is stated as follows: "The State Engineer of New Mexico has no right to maintain these actions by way of injunction against these defendants, such right not having been conferred upon him by law, and the State Engineer has not been given authority by law to maintain such an action in the name of the state upon the relation of the State Engineer."

These suits were styled "The State of New Mexico on the Relation of John H. Bliss, State Engineer" as plaintiff. The contention is that this official was not authorized by any law to bring these suits.

The answer is that the suits were not brought by the State Engineer, but by the Attorney General of the state acting through his assistant, and by special counsel employed in the cases.

If there is an error in that part of the title reading, "On the Relation of John H. Bliss, State Engineer" then it will be treated as surplusage.

The public waters of this state are owned by the state as trustee for the people, Murphy v. Kerr, D.C., 296 F. 536; and it is authorized to institute suits to protect the public waters against unlawful use, or to bring any other action whether authorized by any particular statute, if required by its pecuniary interests or for the general public welfare, 49 A. J., 'States, Territories & Dependencies', Sec. 80. The Attorney General is given specific authority "to prosecute and defend all causes in the Supreme Court in which the state is a party or interested. To prosecute and defend in any other court or tribunal, all actions and proceedings, civil or criminal, in which the state may be a party or interested, when, in his judgment, the interest of the state requires such action, or when requested to do so by the governor." Sec. 3-302, N.M.Sts.1941.

The State Engineer has no personal interest in this suit, and it is brought by the Attorney General in behalf of the state alone, as its pleadings indicate. The words "on the relation of John H. Bliss, State Engineer" will be treated as surplusage if necessary. People ex rel. Clark v. Milk Producers Ass'n, 60 Cal.App. 439, 212 P. 957; People ex rel. Warfield v. Sutter Street Ry. Co., 117 Cal. 604, 49 P. 736. The district court recognized the State of New Mexico as the party plaintiff, entitled to prosecute these suits, and so we conclude.

Appellants' Point II is as follows: "State Engineer has no jurisdiction over underground waters under 1907 water code and no authority has been granted him to declare or define underground water basin or regulate issuance of permits in such district until such time as water area has been defined and determined by adjudication suit brought by state engineer under statutes relating to adjudication of water rights."

■ We will assume for the purposes of this case that the 1907 water code, Ch. 49, N.M.L. 1907, and amendments, has no application to underground waters, but see El Paso & R. I. Ry. Co., 36 N.M. 94, 8 P.2d 1064. The Act of 1931 provides that "The waters of underground streams, channels, artesian basins, reservoirs or lakes, having *reasonably ascertainable boundaries,* are hereby declared to be public waters and to belong to the public, etc." 1941 Comp. § 77-1101. It is these waters over which the State Engineer is given jurisdiction. There is no provision in the law that requires an adjudication in court to define or determine the area or boundaries of any of the described waters before the statutory jurisdiction of the State Engineer becomes effective.

It has been assumed by the State Engineer that he had jurisdiction to determine the outer boundaries of such bodies of water since the passage of the 1931 act. This jurisdiction is implicit in the act. We recognized it in the Peters case, infra; and we stated in Yeo v. Tweedy, 34 N.M. 611, 286 P. 970, 976, construing the same provision in a prior act: " * * * Whether the state engineer shall have jurisdiction over such waters is, however, a matter for legislative determination. He will have such jurisdiction as the statute gives him. Vanderwork v. Hewes and Dean [15 N.M. 439, 110 P. 567], supra. Before he can assume jurisdiction over underground bodies he must find that they have boundaries reasonably ascertained by scientific investigations, or by surface indications."

The jurisdiction of the engineer to determine the boundaries of such waters has been recognized by a recent act of the legislature. "It shall be unlawful for any person, firm or corporation to drill or to begin the drilling of a well for water from an underground stream, channel, artesian basin, reservoir or lake (hereinafter referred to as 'underground source') the boundaries of which have been determined and proclaimed by the State Engineer of New Mexico to be reasonably ascertainable, without a valid, existing license for the drilling of such wells issued by the State Engineer of New Mexico in accordance with the provisions of this act, and the rules and regulations promulgated by him in pur-

suance hereof." Ch. 178, Sec. 1, N.M.L. 1949.

▉ A legislative act which requires an officer to determine facts upon which his jurisdiction depends, does not grant either legislative, Panama Refining Co. v. Ryan et al., 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, or judicial authority to such officer, Mutual Film Corp. v. Industrial Comm., 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552; Rainey, Supt. of Banks v. Michel, 6 Cal.2d 259, 57 P.2d 932, 105 A.L.R. 148. And see 11 A. J., Constitutional Law, Secs. 235 et seq.

The State Engineer has the jurisdiction and authority to determine the boundaries of any of the underground waters declared to be public waters, and no judicial determination is necessary to the jurisdiction given him by the laws in question.

▉ No right to the use of water from such sources was obtained by its use by defendants in violation of law, nor can it be. The statutory manner of securing such rights is exclusive. Pecos Valley Artesian Cons. District v. Peters, 50 N.M. 165, 173 P.2d 490. We so held as to the irrigation law of 1907 in Harkey v. Smith, 31 N.M. 521, 247 P. 550. The same legal principles apply here.

The principal question raised is whether the Act of 1931, which we have quoted, that declared the ownership of the waters in question to be in the public, violates the 14th Amendment to the Constitution of the United States and Sec. 18 of Art. 2 of the Constitution of New Mexico, in that it authorizes the state to deprive its citizens and others of their property without due process of law, and denies them the equal protection of the laws; and violates Sec. 20 of Art. 2 of the Constitution of New Mexico in that it authorizes the taking of private property for public use without just compensation.

The whole argument is based on the assumption that the water described in Sec. 1 of the Act of 1931 belongs to the owners of the overlying land. Each of the defendants claims that the underground water under his land is his property acquired through mesne conveyances from the United States, beginning with the patent from the Government and that such patent and mesne conveyances transferred to him the water underlying the land conveyed. In other words, that the common law, or at least the law of correlative rights in such waters, is the law of this state.

Without going into unnecessary detail and without referring to the many cases cited by the parties to this suit, we state that the patents from the United States to public lands issued after 1866, and particularly those issued after the Desert Land Act of 1877, 43 U.S.C.A. § 321 et seq., con-

veyed no interest in, or right to, the use of surface or underlying water with which lands could be irrigated, except such portions thereof as were used to reclaim the particular land applied for under the Act. The substance of the contention of each of the appellants is that he has a vested interest in the title to the water under his lands, to the center of the earth, of which he cannot be deprived by any legislative act.

This question was settled by this court in Yeo v. Tweedy, supra. It was held in that case that the title to the water described in Sec. 1 of the 1931 Act belonged to the public and was subject to appropriation for beneficial uses. We do not deem it necessary to go into this question extensively again, but because of decisions of this and other courts on the question since Yeo v. Tweedy, which was decided April 16, 1930, we will review them.

It was stated in Yeo v. Tweedy that Sec. 1 of Ch. 182, N.M.L.1927, almost identical with the 1931 Act, had always been the law in this jurisdiction. Whether this is correct or not, it is of little importance, as the waters involved in this suit were reserved for the people of New Mexico, to be disposed of under its laws and the decisions of its courts, by an act of the United States Congress of 1877. This act was known as the Desert Land Act and is as follows: "Section 321. It shall be lawful for any citizen of the United States, or any person of requisite age 'who may be entitled to become a citizen, and who has filed his declaration to become such' and upon payment of 25 cents per acre—to file a declaration under oath with the register and the receiver of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one-half section, by conducting water upon the same, within the period of three years thereafter: Provided, however, That the right to the use of water by the person so conducting the same, on or to any tract of desert land of three hundred and twenty acres shall depend upon bona fide prior appropriation; and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights. Said declaration shall describe particularly said one-half section of land if surveyed, and, if unsurveyed, shall describe the same as nearly as possible without a survey. At any time within the period of three years

after filing said declaration, upon making satisfactory proof to the register and receiver of the reclamation of said tract of land in the manner aforesaid, and upon the payment to the receiver of the additional sum of $1 per acre for a tract of land not exceeding three hundred and twenty acres to any one person, a patent for the same shall be issued to him: *Provided,* That no person shall be permitted to enter more than one tract of land and not to exceed three hundred and twenty acres which shall be in compact form." Mar. 3, 1877, c. 107, Sec. 1, 19 Stat. 377, Mar. 3, 1891, c. 561, Sec. 2, 26 Stat. 1096.

We construed this Act as it applied to surface water in State Game Comm. v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421, 460, in our opinions on motion for rehearing and second motion for rehearing. The title to underground waters was not involved in that case but the reasoning applies here, as will be shown later in this opinion.

"In neither case was the 'ownership' of water involved. So far as I am informed no court has ever held that lands granted by a United States patent carried title to running water passing through them. In these states in which the common law of riparian rights is in force, the patents of the United States conveyed to the grantee 'no property in the water itself, but a simple usufruct while it passes along.' United States v. Rio Grande Dam & Irr. Co., 174 U.S. 690, 19 S.Ct. 770, 775, 43 L.Ed. 1136. Likewise, patents to land in the arid states have never been held to convey as property the running water on the granted land.

"But we need not trouble ourselves about the question of the ownership of water in running streams on public lands. Appellee's patent was dated April 20, 1877, after the Desert Land Act (Act of March 3, 1877, 19 Stat. 377, 43 U.S.C.A. § 321 et seq.) had become effective. Assuming that the appellee's title is from the United States, unaffected by any previous Mexican grant, the title to the flowing water was not included in the conveyance; for by the Desert Land Act, '* * * if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately.' Ickes, Sec'y v. Fox [66 App.D.C. 128, 85 F.2d 294], supra. Appellee obtained no title to water or to its use by virtue of the patent from the United States.

\* \* \* \* \* \*

"Regarding the acts of Congress recognizing the right to the use of water in streams and lakes on public lands, it was further stated in California-Oregon Power Co. v. Beaver, etc. Co. [295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356], supra:

" 'The effect of these acts is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain. * * *

" 'If the acts of 1866 and 1870 did not constitute an entire abandonment of the common-law rule of running waters in so far as the public lands and subsequent grantees thereof were concerned, they foreshadowed the more positive declarations of the Desert Land Act of 1877, which it is contended did bring about that result.' * * *

" '* * * The fair construction of the provision now under review (Act of 1877) is that Congress intended to establish the rule that for the future the land should be patented separately; and that all nonnavigable waters thereon should be reserved for the use of the public under the laws of the states and territories named. * * *

" 'Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, if not before, all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since "Congress cannot enforce either rule upon any state," * * * the full power of choice must remain with the state.'

* * * * * *

"I do not doubt but that the water of non-navigable streams had been severed from the public domain of the arid west long before the passage of the desert land act of 1877, by prior acts of Congress as well as by the government's recognition of the customs, laws and court decisions of the western states in relation thereto as intimated in the Ickes Case, and in California-Oregon Co. v. Beaver, etc. Co., supra. If appellee has any fishing rights in the Conchas Lake, it is only by virtue of the statute of 1876 adopting the common law as the rule of practice and decision in this jurisdiction."

The case of California-Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 726, 79 L.Ed. 1356, from the State of Oregon, was decided in 1935,

five years after our decision in the Yeo case. The Supreme Court said: "The sole claim is based upon the common-law rights of a riparian proprietor, which petitioner says attached to the lands when the patent was issued to its first predecessor in title." This is the exact claim here, except as to the nature of the water involved. Portions of the opinions in this case were quoted in the Red River Company case, and like that case it involved running water on the surface of the earth, but we call specific attention to the Desert Land Act of 1877 which, among other things provided for the disposition of unappropriated water as follows: " * * * and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights."

■ The question here is as to the intention of Congress in using the following language: " * * * together with the water of all lakes, rivers, *and other sources of water supply* * * *." Does this include the water dedicated to public use by the Act of 1931? It was the intention of Congress in using the words "other sources of water supply" to cover all water that could be used and appropriated for beneficial use under the laws of the state where the land is located.

As we feel that the Power Company case is decisive here, we quote a considerable portion of that opinion, as follows:

"The question with which we are here primarily concerned is whether—in the light of pertinent history, of the conditions which existed in the arid and semiarid land states, of the practice and attitude of the federal government, and of the congressional legislation prior to 1885—the homestead patent in question carried with it as part of the granted estate the common-law rights which attach to riparian proprietorship. If the answer be in the negative, it will be unnecessary to consider the second question decided by the court below.

"For many years prior to the passage of the Act of July 26, 1866, c. 262, § 9, 14 Stat. 251, 253, [U.S.C. title 43, Sec. 661, 43 U.S. C.A. § 661], the right to the use of waters for mining and other beneficial purposes in California and the arid region generally was fixed and regulated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. The common law with respect to riparian rights was not considered applicable, or, if so, only to a limited degree. Water was carried by means of

ditches and flumes great distances for consumption by those engaged in mining and agriculture. * * * The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection; and the rule applied whether the water was diverted for manufacturing, irrigation, or mining purposes. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. * * *

"This general policy was approved by the silent acquiescence of the federal government, until it received formal confirmation at the hands of Congress by the Act of 1866, supra. * * * Section 9 of that act provides that:

" 'Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed. * * *'

"This provision was 'rather a voluntary recognition of a pre-existing right of pos- session, constituting a valid claim to its continued use, than the establishment of a new one.' * * * And in order to make it clear that the grantees of the United States would take their lands charged with the existing servitude, the Act of July 9, 1870, c. 235, § 17, 16 Stat. 217, 218, [U.S.C. title 30, Sec. 52, 30 U.S.C.A. § 52] amending the Act of 1866, provided that: '* * * all patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the ninth section of the act of which this act is amendatory.'

"The effect of these acts is not limited to rights acquired before 1866. *They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use,* as recognized by *local rules and customs, and the legislation and judicial decisions* of the arid land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain. * * *

"*If the acts of 1866 and 1870 did not constitute an entire abandonment of the common-law rule of running waters* in so far as the public lands and subsequent grantees thereof were concerned, they foreshadowed the more positive declarations of the Desert Land Act of 1877, which it is

contended did bring about that result. That act allows the entry and reclamation of desert lands within the states of California, Oregon, and Nevada (to which Colorado was later added), and the then territories of Washington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, and Dakota, with a proviso to the effect that the right to the use of waters by the claimant shall depend upon bona fide prior appropriation, not to exceed the amount of waters actually appropriated and necessarily used for the purpose of irrigation and reclamation. Then follows the clause of the proviso with which we are here concerned:

"'* * * all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.' [Chap. 107, 19 Stat. at L. 377, U.S.C. title 43, Sec. 321, 43 U.S.C.A. § 321.]

\* \* \* \* \* \*

"That body (the Congress) thoroughly understood that an enforcement of the common-law rule, by greatly retarding if not forbidding the diversion of waters from their accustomed channels, would disastrously affect the policy of dividing the pub-lic domain into small holdings and effecting their distribution among innumerable settlers. In respect of the area embraced by the desert land states, with the exception of a comparatively narrow strip along the Pacific seaboard, it had become evident to Congress, as it had to the inhabitants, that the future growth and well-being of the entire region depended upon a complete adherence to the rule of appropriation for a beneficial use as the exclusive criterion of the right to the use of water. \* \* \* Necessarily, that involved the complete subordination of the common-law doctrine of riparian rights to that of appropriation. And this substitution of the rule of appropriation for that of the common law was to have momentous consequences. It became the determining factor in the long struggle to expunge from our vocabulary the legend 'Great American Desert,' which was spread in large letters across the face of the old maps of the far west.

"In the light of the foregoing considerations, the Desert Land Act was passed, and in their light it must now be construed. By its terms, not only all surplus water over and above such as might be appropriated and used by the desert land entrymen, but 'the water of all lakes, rivers, and *other sources of water supply* upon the public lands and not navigable' were to remain 'free for the appropriation and use of the

public for irrigation, mining and manufacturing purposes.' If this language is to be given its natural meaning, and we see no reason why it should not, it effected a severance of all waters upon the public domain, not *theretofore appropriated, from the land itself*. From that premise, it follows that a patent issued thereafter for lands in a desert land state or territory, under any of the land laws of the United States, carried with it, of its own force, no common-law right to the water flowing through or bordering upon the lands conveyed.

" * * * The opinion, dealing with the question of riparian rights, said that it was within the power of any state to change the common-law rule and permit the appropriation of the flowing waters for any purposes it deemed wise. Whether a territory had the same power the court did not then decide. Two limitations of state power were suggested: First, in the absence of any specific authority from Congress, that a state could not by its legislation destroy the right of the United States as the owner of lands bordering on a stream to the continued flow, so far, at least, as might be necessary for the beneficial use of the government property; and, second, that its power was limited by that of the general government to secure the uninterrupted navigability of all navigable streams

within the limits of the United States. With these exceptions, the court, however, thought that by the acts of 1866 and 1877 'Congress recognized and assented to the appropriation of water in contravention of the common-law rule as to continuous flow,' and that 'the obvious purpose of congress was to give its assent, so far as the public lands were concerned, *to any system,* although in contravention to the common-law rule, which permitted the appropriation of those waters for legitimate industries.'

\* \* \* \* \* \*

"The Supreme Court of Oregon in Hough v. Porter, 51 Or. 318, 95 P. 732, 98 P. 1083, 102 P. 728, held that the legal effect of the language already quoted from the Desert Land Act was to dedicate to the public all interest, *riparian or otherwise, in the waters of the public domain,* and to abrogate the common-law rule in respect of riparian rights as to all lands settled upon or entered after March 3, 1877. The supplemental opinion which deals with the subject beginning [51 Or.] at page 382 [98 P. 1083] is well reasoned, and we think reaches the right conclusion. \* \* \*

\* \* \* \* \* \*

"As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. \* \* \* The fair construction of the provision (Act of 1877) now under review is that Con-

gress intended to establish the rule that for the future the land should be patented separately; and that all nonnavigable waters thereon should be reserved *for the use of the public under the laws of the states and territories named.* The words that the water of all sources of water supply upon the public lands and not navigable 'shall remain and be held free for the appropriation and use of the public' are not susceptible of any other construction. The only exception made is that in favor of *existing* rights; and the only rule spoken of is that of *appropriation.* It is hard to see how a more definite intention to sever the land and water could be evinced. The terms of the statute, thus construed, must be read into every patent thereafter issued, with the same force as though expressly incorporated therein * * *.

&ast; &ast; &ast; &ast; &ast; &ast;

"Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, *if not before,* all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain."

The Desert Land Act provided that all waters *upon* the public lands (except navigable waters) were to remain * * * free for the appropriation and use of the public. It was not intended to be taken literally that such waters must be upon the surface of the earth to be subject to such use. Waters of underground rivers with defined banks have always been subject to appropriation. We conclude that all water that may be used for irrigation was reserved by the Desert Land Act to be used beneficially by the public, as provided by the laws of the arid states. No interest in such waters was conveyed by a United States patent. The United States Supreme Court has always looked to the laws and decisions of the state courts to determine the extent to which the authority of the state over such water had been exercised. Howard v. Perrin, 200 U.S. 71, 26 S.Ct. 195, 50 L.Ed. 374; Snake Creek Mining & Tunnel Co. v. Midway Irr. Co., 260 U.S. 596, 67 L.Ed. 423. The Supreme Court of Utah has changed its theory of the law of appropriation several times, but the United States Supreme Court follows its latest decision. See the Snake Creek Case.

After different conclusions as to the status of artesian water, the Supreme Court of Utah in Riordan v. Westwood, Utah, 203 P.2d 922, 926, stated that until 1935 its

decisions treated the water of artesian basins as percolating water and as such the ownership went to the owner of the ground where such water was located and was not considered to be subject to appropriation; but that in Glover v. Utah Oil Refining Co., 62 Utah 174, 218 P. 955, 31 A.L.R. 900, it had concluded differently and that the doctrine of percolating waters and correlative rights had no application to artesian basins such as were involved in that case; that such waters were subject to appropriation and the doctrine that "the first in time is the first in right" governed. The history of the law of artesian wells and underground waters in that state is gone into in an exhaustive opinion, with the conclusion that such water is subject to appropriation and that one who went on another's land and drilled a well for artesian water was not precluded from applying for an appropriation of such water.

Under the laws of Idaho the law of "first in time is first in right" in applying subterranean waters to a beneficial use, is approved in Hinton v. Little, 50 Idaho 371, 296 P. 582. It was held in the case of Maricopa County, etc., Dist. v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369, that underground water was not subject to appropriation *under the laws of Arizona.*

In the state of California the doctrine of correlative rights is in force. The following cases are of interest, although they have no application here: Orchard v. Cecil F. White Ranches, Cal.App., 217 P.2d 143; City of Pasadena v. City of Alhambra, 33 Cal.2d 908, 207 P.2d 17; Hillside Water Co. v. City of Los Angeles, 10 Cal.2d 677, 76 P.2d 681. This doctrine seems to have been established by the decisions of the courts of California, the first of which is Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236.

We hold that under the Federal law and that of New Mexico the waters described in Sec. 1 of the Act of 1931 are subject to appropriation under that Act.

Defendants attack the statute of 1931 as being vague and uncertain to the extent that it does not meet the requirements of the due process clause of the Federal and State Constitutions. It is asserted that the standard by which the public character of underground water is determined, i. e., those "having reasonably ascertainable boundaries" is not sufficiently certain to meet this test of constitutionality when applied to newly developed underground sources. Defendants admit that the south, east and west boundaries of the Roswell basin not only are ascertainable but have been ascertained. Their lands lie toward the south end of the basin, and there are hundreds of wells to the north. For all practical purposes the north boundary is located at or beyond the location of the wells furtherest north.

In the enactment of statutes reasonable precision is required. Legislative enactments may be declared void for uncertainty if their meaning is so uncertain that the court is unable, by the application of known and accepted rules of construction, to determine what the legislature intended with any reasonable degree of certainty. But absolute or mathematical certainty is not required in the framing of a statute. State v. Schaeffer, 96 Ohio St. 215, 117 N.E. 220, L.R.A.1918B, 945; State v. Northwest Poultry & Egg Co., 203 Minn. 438, 281 N.W. 753. "The use of such terms as 'reasonable' or 'unreasonable' in defining standards of conduct or in prescribing charges, allowances and the like, * * * have been held not to render a statute invalid for uncertainty and indefiniteness." 50 Am.Jur. Statutes, Sec. 473.

In the case of Sproles v. Binford, 286 U.S. 374, 52 S.Ct. 581, 587, 76 L.Ed. 1167, the Supreme Court of the United States had under consideration a Texas statute which was attacked for uncertainty because in regulating the use of highways by trucks it used the words "shortest practicable route" and other allegedly vague expressions. In holding the statute valid the Supreme Court said: "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding. * * *

The use of common experience as a glossary is necessary to meet the practical demands of legislation. In this instance, to insist upon carriage by the shortest possible route, without taking the practicability of the route into consideration, would be but an arbitrary requirement, and the expression of that which otherwise would necessarily be implied, in order to make the provision workable, does not destroy it."

The word "reasonably" is defined "In a reasonable manner, moderately; tolerably; sufficiently." (Webster's International Dict.). The legislature knew that the exact meanderings of the boundaries of any underground body of water could not be determined. The qualifying word "reasonably" was used in the sense of "sufficiently". The boundaries must be sufficiently ascertainable for the purposes of the act. Of course there is difficulty involved in determining such boundaries. But we are of the opinion that three boundaries having been established and that the other necessarily exists, that the defendants who are within the boundaries cannot complain, even though the other could only be established by the unnecessary drilling of wells for such purpose. For all practical purposes, the boundaries have been sufficiently established by the State Engineer, and that is all that the law requires.

The Act of 1931 has been in effect for 19 years during all of which time it has

been applied in the administration of underground water sources throughout New Mexico. Eight such sources are now administered by the State Engineer.

There are about one million acres of irrigated land in New Mexico and nearly one-third, or about 300,000 acres are irrigated from wells based upon water rights issued under the Act of 1931. There are about 100,000 acres irrigated from the Roswell basin, of the value of nearly $25,-000,000. Titles to this property are involved, and any decision affecting them adversely would be disastrous to the economy of the state.

 It would be anomalous indeed if this court, after such a history of successful application of the statute should now determine that it is void for vagueness and uncertainty. The statute is not void for the reasons stated.

It is asserted that "the operation of said law by the State Engineer has been discriminatory, arbitrary and unlawful and has operated to deny the defendants the equal protection of laws and to result in special privileges being extended to others similarly situated."

 The trial court found as a fact "That the State Engineer has not discriminated against any of the parties hereto in his administration of the underground water law, either in so far as it affects the

shallow water basin or the artesian basin with which these suits are concerned." This finding is supported by substantial evidence. The operation of the Act by the State Engineer denies the defendants no constitutional right.

It is said that "by said act, no method of determining the boundaries of a district is set forth and defined, and no rules relating thereto have been provided by the Legislature or by regulations of the State Engineer, and no method in the determination of such boundaries is afforded or has been afforded which provides due process of law to these defendants."

The defendants admit that the East, South and West boundaries have been determined, and the evidence is conclusive that they are within the boundaries of the Roswell Artesian basin and the overlying valley fill. For all practical purposes the boundaries of the basins have been ascertained. No specific rule for determining the boundaries is required.

 It is said that the valley fill is not a reservoir or lake, and therefore is not within Sec. 1 of the Act; that "no one ever heard of a lake or reservoir with a sloping water table." One definition of a reservoir is "A place where water is collected and kept for use when wanted." (Webster). Whether the water table "slopes" we need not determine. We will assume that the law of gravitation will take care of that.

We know that the valley fill is a reservoir from which billions of gallons of water are pumped to irrigate annually 45,000 acres of land, so it must be collected there; and the legislature aptly called such containers of water, reservoirs or lakes. The case of Maricopa County v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369, is not in point. It was held in that case that the laws of Arizona for the appropriation of water for irrigation had application to surface water only. And see Howard v. Perrin, supra.

There is another consideration which requires the affirmance of the trial court's decree. The decision of Yeo v. Tweedy, supra, has become a rule of property. In the nineteen years since that decision it may be assumed that many thousands of acres of the one hundred thousand irrigated with water from the Roswell Artesian basin and the valley fill have been sold to purchasers who relied on that decision as determining title to the right to use the water here involved, and the water rights to which would be injured or destroyed if Yeo v. Tweedy is overruled. Whether it stated the correct rule of law (and we are of the opinion that it did), it is now a rule of property that we will not disturb. On this question plaintiff cites the following cases, which support our conclusion: In re Lewis' Will, 41 N.M.

522, 71 P.2d 1032; Baca v. Chavez, 32 N. M. 210, 252 P. 987; Duncan v. Brown, 18 N.M. 579, 139 P. 140; Smith v. McDonald, 42 Cal. 484.

The parties have stipulated in this court to facts that show all lands of defendants involved here were patented after March 1877, the date of the Desert Land Act; and before the Act of 1931. We have concluded that the water involved was reserved, on or before the date the Desert Land Act became effective, to the State of New Mexico as trustee for the public, and subject to its use by the public at any time thereafter, by authority of the state statutes, even though passed after the date of the patents to the lands of the defendants. The patents to defendants' lands carried no right to the use of water, except as to that actually applied to the reclaiming of land under the Desert Land Act, and not thereafter abandoned. All other water belonged to the State as trustee for the public.

Other questions are raised but all are obviously without merit or are determined by our decision on other questions.

The decree of the district court is affirmed, and it is so ordered.

LUJAN, SADLER, McGHEE and COMPTON, JJ., concur.